Submitted on record and briefs July 24, reversed September 17, 2003

In the Matter of Raymond North,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

RAYMOND RANDALL NORTH,
*Appellant.*

0109-69775; A116287

76 P3d 685

Paul L. Breed filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Paul L. Smith, Assistant Attorney General, filed the brief for respondent.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

BREWER, J.

## BREWER, J.

Appellant appeals a judgment adjudicating him to be a mentally ill person and committing him to the Mental Health Division. The trial court found that appellant was unable to provide for his basic personal needs and was not receiving such care as is necessary for his health or safety. ORS 426.005(1)(d)(B).[1] On *de novo* review, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), we reverse.

We consider the facts as they existed on September 28, 2001, the date of the hearing. *State v. King*, 177 Or App 373, 377, 34 P3d 739 (2001). At that time, appellant was 31 years old. He had been taken to Woodland Park Hospital two weeks earlier, after police responded to complaints that he was wandering around the parking lot of his apartment building in his bathrobe and causing a loud disturbance. Appellant had been hospitalized for mental health problems at least five other times, the last time in 1994. Various medications were prescribed for him at those times, but he had not taken any medication for at least two years before the hospitalization at issue here. While at Woodland Park Hospital, appellant was given four different medications, including an antipsychotic and a mood stabilizer. At the hearing, appellant testified that the medication had "been very helpful" and "very good for me." He stated that he had agreed to take the medication in part because he "wanted to be cooperative to get out of the hospital" but also because his doctor had discussed the medication with him so that he understood it "well enough to be confident with it." He testified that, if released from the hospital, he would continue to take the medication.

At the hearing, appellant's community case manager, Doty, testified that she had worked with appellant for two years. She stated that she did not believe that appellant

---

[1] ORS 426.005(1)(d) provides, in part:

" 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:

"(A) Dangerous to self or others.

"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

would continue to take his medication. Doty explained that appellant previously had stopped taking his medication several times and that, during the past two years, representatives of appellant's community mental health provider had wanted him to see a psychiatrist and a "prescriber" and that he had refused to cooperate. Doty also testified that appellant is unable to sustain employment and that he receives food stamps. She stated that his family has given her money to manage for him in order to ensure that his car insurance premiums are paid and that he has enough money to buy groceries if his food stamps run out.

Doty testified further that appellant has difficulties in dealing with other people. As an example, she noted that appellant likes to play his guitar and sing on street corners. Doty related an incident where someone complained about his music, to which appellant responded by simply moving across the street. In another incident, someone assaulted appellant and smashed his guitar "because he didn't respond and tone it down or change his music or go away." Doty stated, "And I think he didn't even realize how he was setting himself up for that kind of trouble."[2] Finally, Doty stated that appellant's apartment manager had told her the night before the hearing that she was willing to let appellant come back to the apartment with the understanding that, if there were any more incidents, he would be asked to leave within 48 hours.

The apartment manager also testified at the hearing. She stated that she had been in appellant's apartment during the past two weeks and that it was very dirty, but she declined to describe it as "dangerous dirty." She also stated that she had received several complaints from other tenants about appellant's "outrageous" behavior on the apartment premises. She testified that no action had been taken while appellant was in the hospital and that she would have to discuss the situation with the apartment owner, but that it was possible that appellant would be evicted based on his neighbors' complaints.

---

[2] Appellant argued in response that he had been mugged and that he had not been playing his guitar at the time of the incident.

Two medical examiners questioned appellant and the other witnesses. At the conclusion of the hearing, one examiner made the following oral report to the court:

"Well, I think we've seen [appellant] present and his best effort today. He seems to be a highly intelligent kind man who still, unfortunately, is not stable in his mental illness.

"He's displayed rapid pressured speech with rambling, disjointed tangential thinking. Appears paranoid. I think that he does understand his medications, but has a history of not being compliant or understanding the necessary means to take his medications as an outpatient.

"He doesn't have services within the community to ensure he will continue the medication. He has a tenuous housing situation that resulted (indiscernible) to place him in immediate harm's way.

"I don't think he's capable of maintaining his safety. He's had a recent assault within the last month. He's been unpredictable in the community with bizarre behavior that has frightened others.

"And at this time, for his best interest and to stay out of harm's way, I think he needs structure and supervision to maintain his safety and commitment to the Mental Health Division."

The other examiner concurred in that report. Both examiners also filed written reports in which they opined that appellant was unable to provide for his basic needs and that he was a danger to himself because he was unable to stay out of harm's way. The examiners based their conclusions on the perceived likelihood that appellant would be evicted from his apartment, on his poor judgment and lack of insight, and on his disorganized thinking.

The trial court found that appellant had suffered a recent, rapid deterioration in his mental state that led him to be unable to provide for his basic needs. The court further found that, if returned to the community, appellant would not continue to take his medication. On that ground, the court found that appellant was either unable, unwilling, or unlikely to participate in treatment on a voluntary basis. The court committed appellant to the Mental Health Division.

Appellant appeals from the ensuing judgment of commitment.

Appellant concedes that he suffers from a mental disorder but argues that the evidence does not establish that he is unable to provide for his basic needs. The state responds that the evidence is sufficient. It also urges us to affirm the trial court's judgment on the alternative ground that appellant is a danger to himself. *See State v. Turel*, 182 Or App 235, 241, 48 P3d 175 (2002) (addressing the state's "right for the wrong reason" argument in a mental commitment proceeding).

■ We first consider whether appellant is able to provide for his own basic needs. In *State v. Bunting*, 112 Or App 143, 145-46, 826 P2d 1060 (1992), we summarized the principles governing "basic needs" cases:

"The legislature's 'basic needs' commitment standard focuses on the capacity of the individual to survive, either through his own resources or with the help of family or friends. The state must establish by clear and convincing evidence[3] that the individual, due to a mental disorder, is unable to obtain some commodity (*e.g.*, food and water) or service (*e.g.*, life-saving medical care) without which he cannot sustain life. The statute does not express a standard by which the imminence of the threat to life is to be measured.

"A speculative threat, such as the failure to take medicine * * *, is not by itself sufficient. However, the state need not postpone action until the individual is on the brink of death. The goal of the commitment statute is safe survival, not merely the avoidance of immediate death.

"* * * A person is subject to a 'basic needs' commitment * * * if clear and convincing evidence demonstrates that, due to a mental disorder, there is a likelihood that the person probably would not survive in the near future because the person is unable to provide for basic personal needs and is not receiving care necessary for health or safety."

(Footnote omitted.) Basic needs also include clothing and shelter. *Turel*, 182 Or App at 240.

---

[3] Clear and convincing evidence is evidence that makes the fact in issue highly probable, *King*, 177 Or App at 377, that is, "evidence of extraordinary persuasiveness," *State v. Simon*, 180 Or App 255, 263, 42 P3d 374 (2002).

.

The state argues that the evidence proves that appellant "would soon have no place to live." Appellant contends that the evidence on that issue is unclear. He points out that, although his apartment manager testified that she *could* evict him, she was sympathetic to him and appeared to be willing to give him another chance. Appellant testified that he recognized that taking his medication "would be highly influential and effective on [*sic*] precluding an eviction." In response, the state emphasizes evidence indicating that appellant would be unlikely to continue taking medication.

We need not resolve that dispute, however, because the state failed to adduce clear and convincing evidence that, even if appellant were evicted from his apartment, he would be unable to find other shelter or that his ability to survive in the near future would be threatened. *See State v. Webb*, 186 Or App 404, 409, 63 P3d 1258 (2003) (holding that, "[a]lthough the law does not require that a threat of harm be immediate, it does require that the threat be real and exist in the near future"); *see also State v. Baxter*, 138 Or App 94, 98, 906 P2d 849 (1995) ("by itself, failing to take medication is not sufficient if it causes only a speculative threat"). Appellant was never asked what he would do if he were evicted from his apartment, but his responses to other questions demonstrate that he understood the need for shelter, as well as the intricacies of obtaining it. *Cf. State v. Johnson*, 117 Or App 237, 240, 843 P2d 985 (1992) ("Defendant's mental disorder impairs her ability to recognize that shelter is a basic need."). For example, appellant stated, "I feel that it might be in my best interests within the next year to two years to get another apartment, no matter how well some things work out, because I might need another reference * * *." The evidence also showed that appellant's parents have been willing to assist him financially. Moreover, the state failed to show any specific threat to appellant's survival that might result if he were evicted. *Cf. Baxter*, 138 Or App at 99 ("Although the lack of certain shelter is not a good plan, we cannot say that homelessness by itself is sufficient grounds for commitment.").

The evidence showed that appellant had established relationships with several health care workers, including Doty, to whom he was willing and able to turn for assistance

in providing for his basic needs. The fact that appellant was using food stamps shows that he, or someone who helped take care of him, understood how to obtain access to public services. Moreover, appellant's family cared about his fate and was willing to provide support for him. We conclude that the evidence does not show that it was highly probable that appellant's survival in the near future was at risk.

We turn to the state's argument that we should affirm the trial court's judgment on the ground that clear and convincing evidence shows that appellant was a danger to himself. *See* ORS 426.005(1)(d)(A) (danger to self or others is a basis for finding mental illness). The state contends that Doty's account of the assault on appellant while he was playing his guitar shows that he was unable to stay out of harm's way. The state's argument fails for two reasons. First, "[t]he state must present clear and convincing evidence that a person's mental disorder has resulted in harm or created situations likely to result in harm." *Turel*, 182 Or App at 241 (internal quotation marks and citations omitted). Here, the state failed to show that appellant suffered any serious harm as a result of his mental disorder. Second, "[a]pprehensions, speculations and conjecture are not sufficient to prove a need for mental commitment." *State v. Ayala*, 164 Or App 399, 404, 991 P2d 1100 (1999) (citations omitted). Although the evidence here shows that appellant has some difficulty interacting with other people, it does not show that, at the time of the hearing, he was likely to be assaulted again, much less that there was any life-endangering threat in the near future. *State v. Jacobson*, 142 Or App 371, 377, 922 P2d 670 (1996) (threat must exist in the near future).

The state failed to prove by clear and convincing evidence that appellant's survival in the near future was threatened. We therefore conclude that the state failed to establish that appellant was unable to provide for his basic needs or that he was a danger to himself and, as a consequence, it failed to prove that appellant was a mentally ill person within the meaning of ORS 426.005(1)(d).[4]

Reversed.

---

[4] Appellant also assigns error to the trial court's finding that he was either unable, unwilling, or unlikely to participate in treatment on a voluntary basis. Because we conclude that the state failed to show that appellant is a mentally ill person within the meaning of ORS 426.005(1)(d), we do not reach his second assignment of error.