Argued and submitted March 27, reversed May 17, 2006

In the Matter of Dennis Judd,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

DENNIS JUDD,
*Appellant.*

0412-72651; A127031

135 P3d 397

Laurie Bender argued the cause and filed the brief for appellant.

Seann C. Colgan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman and Rosenblum, Judges.

ROSENBLUM, J.

**ROSENBLUM, J.**

The trial court committed appellant to the custody of the Department of Human Services (DHS) after finding that, because of a mental disorder, he was dangerous to himself and unable to provide for his own basic needs. ORS 426.005(1)(d)(A), (B); ORS 426.130. Appellant contends on appeal that the findings are not supported by clear and convincing evidence. The state concedes that the record does not support the "basic needs" finding but argues that the trial court correctly concluded that appellant was dangerous to himself. On *de novo* review, *State v. North*, 189 Or App 518, 520, 76 P3d 685 (2003), we conclude that the facts demonstrating that he is a danger to himself do not rise to the level of clear and convincing evidence, and we therefore reverse.

We consider the facts as they existed on December 10, 2004, the date of the commitment hearing. *Id.* For purposes of this appeal, appellant does not dispute that he suffers from a mental disorder, although he has at times denied it.[1] The events that led to the commitment hearing occurred on December 5, 2004. Appellant's behavior was certainly bizarre. Appellant went to a church wearing underwear on the outside of his pants and either shirts or underwear wrapped around his head. He initially believed that he was to marry the pastor's daughter that day, but after arriving at the church, he asked a number of other women to marry him. He became "mouthy" in response to church members' reactions to him. Appellant was taken to the hospital by members of the church. At the hospital, appellant got into an argument with staff members and hospital security after he refused to remove sheets and towels that he had wrapped around his head and neck. He became very agitated, threw crackers at the staff members and security guards, and tried to bolt from the hospital. He had to be forcibly taken to the floor by security guards and placed in restraints.

---

[1] The record does not reveal the precise nature of appellant's mental disorder. The two examiners at the hearing opined that he suffers from schizoaffective disorder or bipolar disorder with psychotic features.

The events at the church and the hospital were not the first incidents of odd behavior by appellant. He has a history of difficulties arising from his disorder. After having been stable for a number of years, his condition began to deteriorate in the spring of 2003. He has had several medications prescribed for his mental disorder, but he stopped taking them consistently and, at times, has refused to take them at all. He was evicted from his housing twice in 2003 for unspecified aggressive behavior. By April 2004, he had been hospitalized eight times in 11 months. On April 23, 2004, appellant was committed after he physically intimidated and threatened to kill his father and proclaimed that he was the savior and that he planned to be crucified in public. Appellant had not been taking any medication and denied that he needed it. In the hospital, appellant was abusive and threatening with a staff member when she tried to redirect him from telling other patients not to take their medications.

Appellant was released on "trial visit" status to the Bridgeview Community Shelter, a transitional residential facility for people with chronic mental illness. By mid-November 2004, he had begun refusing at least two medications that were prescribed for his mental condition. By the end of the month, he had stopped taking medication altogether, including one used to manage his non-insulin-dependent diabetes. As noted, the incidents at the church and the hospital took place shortly thereafter, on December 5, 2004.

After appellant was hospitalized on December 5, a mental health investigator, Lopez, conducted a precommitment investigation, part of which consisted of two interviews with appellant. Appellant acknowledged the altercation that he had had with hospital staff and security as well as previous incidents of aggressive behavior. He told Lopez that he "might have" taken a swing at a security guard but was not sure. He also acknowledged that he was having difficulty complying with his medication regimen. He told Lopez that he did not believe that he is mentally ill or that he needs medication. When Lopez told him that he would face a commitment hearing if he did not take his medications, appellant said that he would take them, but he could not articulate a plan for how he would get them.

Appellant also told Lopez that he did not plan to return to the Bridgeview shelter when released. He made various claims concerning his financial situation, asserting that he had been given a credit card with unlimited funds, that a doctor had given him $300 million, that he had been offered a management job at Nordstrom's, and that the Seattle Mariners had hired him to manage their ticket sales. He also stated that a large home had been built especially for him in Washington and that he intended to live there. Appellant claimed that his $300 million windfall was in his bank account, but when asked for confirmation, he was unable to look up the bank's phone number or, after receiving assistance in finding the number, to navigate the bank's automated telephone system.

Lopez concluded that appellant was unable to meet his basic needs and was a danger to others. On his recommendation, the trial court conducted a commitment hearing. At the hearing, two examiners, Mohler and McCubbin, questioned appellant. Appellant stated that he had been taken to the hospital because he was "a little bit too exhibitionist-like in church last week" and was "kind of mouthy about how they were reacting to me." When Mohler asked appellant whether he thought that he needs to take psychiatric medications, appellant stated, "Not really." Mohler asked appellant what he would like the trial court's disposition to be. Appellant responded that he "would like to be given a stern warning" and to be "told not to talk to people like I've been talking." Mohler also asked appellant about his earlier statement that he planned to be crucified. Appellant stated that he had wanted to be crucified as a way of "cancel[ling] out everybody's debts unilaterally worldwide." Appellant acknowledged that, every time he mentioned crucifixion, "it really terrifie[d] people."

McCubbin's questioning included the following exchange:

"[McCubbin:]   Do you get angry much?

"[Appellant:]   Oh, yeah.

"[McCubbin:]   What do you get angry at?

"[Appellant:] Just have an allergic reaction to things inside, a bang and pop.

"[McCubbin:] At who? Who do you (indiscernible) your anger is?

"[Appellant:] People that don't seem to be very understanding and it gets very frustrating."

McCubbin also asked appellant whether he thought he was dangerous to other people. Appellant answered, "Only when agitated by them." He denied having ever hurt anyone physically but stated that he had threatened people with his fists.

After the examiners finished questioning appellant, the court asked for their opinions. Mohler stated that, in his view, appellant was unable to meet his basic needs and, because of his "unusual thinking" and impulsive behavior, was unable to stay out of harm's way. McCubbin agreed, stating, "He creates a ruckus and doesn't realize the import of it, and I think that someone is likely to harm him * * *." The court found that appellant suffers from a mental disorder and, as a result, was dangerous to himself and unable to provide for his basic needs. It entered a judgment ordering that appellant be committed to DHS.

On appeal, appellant argues that the trial court's findings are not supported by clear and convincing evidence, as required by ORS 426.130(1)(b). With respect to basic needs, appellant contends that there is no evidence that he would not likely survive in the near future. He argues that neither his mental disorder nor his diabetes is life-threatening, so his failure to take medication is not evidence of inability to provide for a basic need. He also argues that there is no evidence that he failed to provide for any other basic need. With respect to being a danger to himself, appellant contends that a mere recitation of past acts does not clearly form the foundation for a prediction of future dangerousness. He asserts that the record does not show that he would engage in overt acts of violence.

The state concedes that the record does not support a "basic needs" commitment. The state asserts, however, that there is sufficient evidence that appellant was unable to stay

out of harm's way and was thus a danger to himself. According to the state, appellant's physical altercation with the hospital security guards illustrates the potentially volatile nature of the situations he instigates, and his history of repeated hospitalization and aggressive and threatening conduct establishes a pattern of such behavior. The state does not assert that appellant was highly likely to become overtly violent—either toward others or himself—but that he was likely to provoke other persons to become violent and harm him.

We accept the state's concession with respect to basic needs. For the reasons that appellant asserts, the record does not support commitment on that ground. *See State v. Brungard*, 101 Or App 67, 71, 789 P2d 683 (1990) ("Basic needs are those things necessary to sustain life."); *see also State v. Cunningham*, 190 Or App 202, 211, 78 P3d 125 (2003) (refusal to take medication is not sufficient, by itself, to prove an inability to provide for basic personal needs if condition for which medication is prescribed is not life-threatening).

■■■ With respect to appellant's dangerousness to himself, we agree with appellant that the record does not support commitment. We have held that "a person can be deemed dangerous to self if he or she has established a pattern in the past of taking certain actions that lead to self-destructive conduct, and then he or she begins to follow the pattern again." *State v. Roberts*, 183 Or App 520, 524, 52 P3d 1123 (2002). However, the state must present clear and convincing evidence that a person's mental disorder has resulted in harm " 'or created situations likely to result in harm.' " *State v. Sea*, 137 Or App 333, 338, 904 P2d 182 (1995) (quoting *State v. Christofferson*, 47 Or App 1087, 1090, 615 P2d 1152 (1980)); *see also State v. Shorett*, 194 Or App 587, 595, 95 P3d 1146 (2004) (" 'Clear and convincing evidence' is evidence of 'extraordinary persuasiveness,' such that the 'truth of the facts asserted is highly probable.' " (Citations omitted.)). Furthermore, although the threat of harm need not be immediate, the state must show that it will exist in the near future. *State v. Hambleton*, 202 Or App 526, 534, 123 P3d 370 (2005).

Our cases do not clearly define what "harm" means, but they indicate that, at a minimum, it involves physical injury. In *State v. Powell*, 178 Or App 89, 91, 94, 35 P3d 1084 (2001), for example, we held that there was no evidence that the appellant had suffered any harm even though she had for several minutes hit her head repeatedly against a Plexiglass window in a police car "hard enough to make [the officers in the car] jump." Other cases suggest that a potential harm must be life-threatening. *See, e.g., State v. Turel*, 182 Or App 235, 242, 48 P3d 175 (2002) ("[A]ppellant's open wounds and the fact that he picks at them are insufficient to establish a danger-to-self commitment because there is nothing in the record to put that in context as to how that could present a life-threatening condition."); *State v. Nguyen*, 180 Or App 541, 545, 43 P3d 1218 (2002) ("All the evidence indicates that it will be years before his diabetes will be life threatening * * *."); *cf. State v. Bolander*, 178 Or App 514, 519, 37 P3d 216 (2001) (by walking on the roof of her rooming house without shoes on, the appellant put herself in an "inherently dangerous" situation, showing that she could not keep out of harm's way).

In this case, there is no evidence that appellant's behavior has ever resulted in physical harm to him, life-threatening or otherwise. Nothing about the incident at the church suggests that appellant created a situation that was dangerous to him. Although his behavior was bizarre, there is no indication that he was likely to provoke violence. Odd behavior alone is not a sufficient basis for commitment. *See Hambleton*, 202 Or App at 534 (swimming nude in 40-degree weather was not evidence of dangerousness to self where there was no evidence that the appellant suffered any harm as a result); *State v. Webb*, 186 Or App 404, 409-10, 63 P3d 1258 (2003) (concerns that the appellant would be assaulted while riding her bicycle nude in unsafe neighborhoods did not justify commitment because the appellant had engaged in the same behavior repeatedly and had never been assaulted).

The only incident reflected in the record that involved a physical altercation was at the hospital when appellant was forcibly restrained by security, and there is no indication that he suffered any harm, let alone serious injury.

Furthermore, there is little reason to believe that the situations that appellant created were even *likely* to result in harm. If appellant did, in fact, take a swing at a security guard at the hospital, that might provide a basis for such a conclusion. But the only evidence in the record as to that possibility is appellant's statement to the precommitment investigator that he "might have" taken a swing at a guard, but he was not sure. That is not clear and convincing evidence.

Nothing else in the record indicates that it is highly probable that, in the near future, appellant was likely to be harmed as a result of his mental disorder. There is evidence that appellant can become aggressive, but nothing indicates that his aggression rises to a level that is likely to provoke a violent response. Although appellant stated that he was potentially dangerous to other people, he also stated that he has never physically harmed anyone.

In short, the record establishes at most a pattern of odd behavior suggesting that, unless appellant received appropriate medical care, he was likely to engage in similar behavior again in the future. But there is no evidence that any of the events that made up that pattern of behavior actually led to—or even were likely to lead to—appellant being harmed in any way. Consequently, there is no reason to believe that, if appellant continued to behave in similar ways, his behavior was likely to result in harm to him. The trial court erred in concluding otherwise.

Reversed.