Submitted on record and brief May 16, reversed October 18, 2006

In the Matter of Thomas Ryan Olsen,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

THOMAS RYAN OLSEN,
*Appellant.*

0507-67671; A129702

145 P3d 350

Lance D. Perdue filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Anna M. Joyce, Assistant Attorney General, filed the brief for respondent.

Before Landau, Presiding Judge, and Schuman* and Ortega,** Judges.

LANDAU, P. J.

___

* Schuman, J., *vice* Wollheim, J.
** Ortega, J., *vice* Ceniceros, S. J.

## LANDAU, P. J.

Appellant challenges an order of involuntary civil commitment, arguing that the record is insufficient to support a finding by clear and convincing evidence that he suffers from a mental disorder that renders him a danger to himself. ORS 426.005(1)(d)(A). On *de novo* review, *State v. Hitt*, 179 Or App 563, 565, 41 P3d 434 (2002), we reverse.

The relevant facts are undisputed. At the time of his commitment hearing, appellant was 29 years old. He had recently been transferred to Oregon Health and Science University from the Oregon State Hospital, where he had been in custody for two and one-half years. He had been in several psychiatric hospitals during his life.

The evidence at the commitment hearing consisted of the precommitment examiner's report, the reports of two hearing examiners, and testimony from appellant's mother and appellant himself. In interviews with the precommitment examiner, appellant described having auditory and visual hallucinations. He reported seeing "leprechauns" and other creatures. He claimed that he had been hearing voices since he was 11 years old and that "30 voices" tell him to do things. He also stated that he believed that he could read other peoples' thoughts. The precommitment investigator provisionally diagnosed appellant as suffering from chronic schizophrenia and concluded that he needed to remain in custody because he was "totally unable to assist in any discharge planning or realistic discussion of his future," was unable to identify any of the medications he was taking, and had not arranged for things such as outpatient services or a place to live.

At the commitment hearing, appellant testified that he planned to move to Seattle and stay with a friend whom he had contacted. He repeatedly expressed his desire to be released. He asserted that he was able to take care of himself and that he would be able to arrange to get the medications that he needed.

Appellant's mother testified that she doubted whether her son had actually made arrangements to stay

with anyone in Seattle, and she believed that he had not spoken with his friend since high school, ten years earlier. The mother testified that she was concerned about her son being out of custody and, in particular, that he would not actually settle in Seattle but would travel aimlessly without taking his medications. She added that, at some unspecified time in the past, he had ended up "on the street" and that he "has a tendency to walk into people's homes." Appellant's mother did not elaborate on the latter remark. The record does not reflect when he had ever walked into people's homes, how often, or what consequences ensued.

When appellant then reiterated his desire to travel to Seattle, the court said that it had not yet decided what to do, but stated that it would be "willing to order a commitment for no more than 60 days instead of no more than 180 days." Appellant rejected that idea, saying that he wanted to go home "today." At that point, examiner Mohler suggested that the proceedings be set over for several days so that, in the meantime, appellant could invite his friend in Seattle to "verify" appellant's future living arrangements and so that appellant could contact other services in Seattle to let them know of his plans to move to the area. Appellant rejected that idea, explaining that he "want[ed] to do this today."

The court then asked the other examiner, McCubbin, his opinion about whether appellant should stay in the hospital. McCubbin said that he believed that appellant should, explaining:

"I think he's a smart guy. I think he looks physically healthy. * * * But I don't think he's making good judgments. I think he's delusional. You know, there are a lot of delusional people out there that think they are flying around on spaceships and things. But they are not—they don't have the history of walking into people's houses. * * *

"* * * * *

"I think he puts himself in harm's way to the point of being dangerous to himself. I think that bad judgment—I think sometime he's got to come to grips that he has a mental disorder. That's not a fun affliction to accept and that he needs medication and that his judgment is impaired and it keeps him from making a plan that even his mother can support.

And I can't support it either. I think he's going to get himself into trouble again if we release him today, you know."

Mohler, concurred, explaining:

"Well, I'm in agreement, that this is a person who's been under the supervision of mental health professionals for two and a half years. And today we see him, and he presents as a pleasant, intelligent, articulate person. And yet his judgment does remain impaired. His insight is limited. He is psychotic.

"And because of those factors and his inability to really have an adequate plan or even work with any mediation of an adequate plan, I think that puts him at immediate risk for being a danger to himself * * *."

In their written reports, both Mohler and McCubbin concluded that appellant suffered from schizophrenia. Mohler specifically noted in his report that appellant was a danger to himself because his

"[j]udgment and insight are impaired to the point of being unable to articulate where he will stay, where he will receive medications, or how he will maintain his health and safety. He has been under care and supervision for last 2½ years and is still unable to describe with validity any plan to care for himself."

McCubbin similarly concluded that appellant, although able to care for his own basic needs, endangered himself "by poor judgment."

At the end of the proceedings, the court concluded that appellant suffered from a mental disorder and, as a result, was a danger to himself and ordered that he be committed to the Department of Human Services (DHS) for 180 days.

■   On appeal, appellant argues that the trial court erred because the state failed to establish by clear and convincing evidence that he suffers from a mental disorder that makes him a danger to himself. We agree.

■   Following a commitment hearing, a court may order the involuntary commitment of an individual to DHS for up to 180 days if the court finds clear and convincing evidence that, because of a mental disorder, the individual is, among

other things, "[d]angerous to self." ORS 426.005(1)(d)(A); ORS 426.130. Whether the state's evidence is sufficient to support commitment on that ground turns on whether a person's mental disorder would cause him or her to engage in behavior that is likely to result in physical harm to himself or herself in the near term. *State v. Webb*, 186 Or App 404, 409, 63 P3d 1258 (2003). Although the law does not require that a threat of harm be immediate, it does require that the threat be real and exist in the near future. *State v. Nguyen*, 180 Or App 541, 545, 43 P3d 1218 (2002). The law also requires that the threat be established by evidence of "extraordinary persuasiveness." *State v. Siebold*, 100 Or App 365, 366, 786 P2d 219 (1990) (internal quotation marks omitted). The state is thus required to present "clear and convincing evidence that a person's mental disorder has resulted in harm 'or created situations likely to result in harm.' " *State v. Sea*, 137 Or App 333, 338, 904 P2d 182 (1995) (quoting *State v. Christofferson*, 47 Or App 1087, 1090, 615 P2d 1152 (1980)).

Although review of any involuntary commitment order is, necessarily, a fact-specific inquiry, *see State v. Roberts*, 183 Or App 520, 524, 52 P3d 1123 (2002) (noting that, in determining whether evidence is sufficient to warrant involuntary commitment, "fact-matching is not helpful"), our cases identify several important principles that inform our analysis in this case. In *Roberts*, for example, we explained that "a person can be deemed dangerous to self if he or she has established a pattern in the past of taking certain actions that lead to self-destructive conduct, and then he or she begins to follow the pattern again." *Id.* In *State v. Bunting*, 112 Or App 143, 145, 826 P2d 1060 (1992), we emphasized that a "speculative" threat, alone, is not sufficient to establish danger to self, an admonition that we have repeated in a number of other cases, as well. *See, e.g., State v. Ayala*, 164 Or App 399, 404, 991 P2d 1100 (1999) ("Apprehensions, speculations and conjecture are not sufficient to prove a need for mental commitment."); *State v. Stanley*, 117 Or App 327, 330, 843 P2d 1018 (1992) ("Apprehensions and speculations alone are not enough to find a person in need of treatment."). We have also explained that delusional or eccentric behavior—even behavior that may be inherently risky—is not necessarily sufficient to warrant commitment,

and we have cautioned that civil commitment is not intended to be used as a "paternalistic vehicle" to "save people from themselves." *State v. Powell*, 178 Or App 89, 95, 35 P3d 1084 (2001).

In applying the foregoing principles, we have held that evidence of an established pattern of riding a bicycle naked through unsafe neighborhoods is insufficient to support commitment, *Webb*, 186 Or App at 409-10, as is evidence of a history of swimming nude in 40-degree weather, *State v. Hambleton*, 202 Or App 526, 534, 123 P3d 370 (2005). On the other hand, we have held that a mental disorder that led to frequent involvement in fights and verbal confrontations was sufficient, *State v. Doe*, 116 Or App 18, 840 P2d 727 (1992), as was evidence of an acute alcohol abuse problem that posed a serious threat to a person's near-term health, *State v. Jacobson*, 142 Or App 371, 922 P2d 670 (1996).

In *Roberts*, we concluded that the trial court erred in committing a mentally ill woman who had a history of frequently "wandering the streets" and not taking her medications. In that case, hearsay evidence suggested that the woman had, on an unknown number of occasions, stepped off the curb and into the street. We reversed, concluding that the record fell well short of containing the requisite "extraordinar[ily] persuasive[ ]" evidence that she was likely to injure herself in the future. 183 Or App at 525.

More recently, in *State v. Judd*, 206 Or App 146, 148-49, 135 P3d 397 (2006), we reversed the involuntary commitment of a person who exhibited bizarre behavior, including going to church "wearing underwear on the outside of his pants and either shirts or underwear wrapped around his head," being argumentative, and being combative with hospital staff. We concluded that the record was insufficient to support commitment because it lacked concrete evidence of instances in which the appellant's behavior resulted in physical harm or even the likelihood of such harm. *Id.* at 154.

■ With the foregoing principles and cases in mind, we return to the facts of this case, concluding that the record lacks the kind of clear and convincing evidence of a particularized threat that is required for involuntary commitment.

To be sure, the evidence at the commitment hearing establishes that appellant suffers from schizophrenia that leaves him prone to hallucinations and that he has a history of exercising "poor judgment." Moreover, the evidence suggests that, at the time of the hearing, appellant had failed to plan for his life outside the hospital in a way that would ensure, for example, stable living arrangements. Evidence of delusions, general lack of judgment, and failure to plan for release, however, is simply not the kind of evidence of a particularized, near-term threat that is required to justify appellant's involuntary commitment on the ground that he is a danger to himself. *See, e.g., Ayala*, 164 Or App at 404; *Stanley*, 117 Or App at 330; *Bunting*, 112 Or App at 145.

The state notes that, in addition to that evidence there is appellant's mother's testimony that, before his most recent hospitalization, appellant had a "tendency" to walk into other people's homes. We agree with the state that evidence of an established pattern of that type of behavior, coupled with evidence that it is likely to continue, might be sufficient to justify involuntary commitment. *Roberts*, 183 Or App at 524. But the state established no such pattern in this case. As we have noted, the record contains the mother's single remark that, at some unspecified time before the hearing—that is, at least two and one-half years ago—her son had a "tendency" to walk into people's homes. McCubbin alluded to the same "history" in his testimony. The record, however, does not reveal how often appellant engaged in that behavior, or under what circumstances it occurred, or whether that behavior ever resulted in actual physical harm. *See Judd*, 206 Or App at 153-54. Nor is there any evidence that appellant is likely to repeat that behavior in the future. *See Roberts*, 183 Or App at 524-25.

In short, the record does not contain the requisite "extraordinarily persuasive" evidence that, owing to his mental disorder, appellant poses a danger to himself. The trial court therefore erred in ordering appellant's involuntary commitment on that ground.

Reversed.