245 P.3d 697 (2010)
240 Or. App. 75
In the Matter of B.B., Alleged to be a Mentally III Person.
STATE of Oregon, Respondent,
v.
B.B., Appellant.
091070858; A143818.
Court of Appeals of Oregon.
Submitted November 23, 2010.
Decided December 29, 2010.
*698 Rebecca Carter filed the brief for appellant.
John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Harry B. Wilson, Assistant Attorney General, filed the brief for respondent.
Before HASELTON, Presiding Judge, and ARMSTRONG, Judge, and DUNCAN, Judge.
HASELTON, P.J.
Appellant appeals from a judgment of involuntary civil commitment, contending that the record is insufficient to support the trial court's determination that she was a danger to herself as a result of her mental disorder. ORS 426.005(1)(e)(A). Pursuant to ORS 19.415(3), unless we exercise our discretion to review the matter de novo, we are bound by the trial court's findings of historical fact that are supported by any evidence in the record; we further review the court's dispositional conclusions, predicated on those findings, for errors of law. State v. D.R., 239 Or.App. 576, 578, 244 P.3d 916 (2010).[1] In this case, we do not exercise our discretion to engage in de novo review;[2] nevertheless, as explained below, *699 we conclude that the evidence is legally insufficient to support the trial court's determination that appellant was a danger to herself. Accordingly, we reverse.
We state the facts "consistently with the trial court's express and implied findings," D.R., 239 Or.App. at 579, 244 P.3d 916, as supplemented with uncontroverted contextual information from the record. At the time of the hearing, appellant was a 31-year-old woman. Symptoms of her mental illness included psychosis, paranoia, auditory "command hallucinations," and visual hallucinations.
The incidents triggering appellant's commitment proceeding took place in October 2009. On October 7, appellant was brought to Providence Hospital in Portland after an incident in which she fell while running with her nine-month-old child in her arms. As a result of her fall, appellant incurred "cuts, abrasions and discolored swelling * * * on her left che[e]k and above her left eye." Appellant told Monaco, a precommitment investigator who interviewed her two days later (on October 9), that she had been running because she was frightened and that the baby did not get hurt during the fall. Appellant told Monaco that she was afraid of B., her boyfriend and the father of her child, who she believed wanted to "get rid" of her because, according to appellant, he had another girlfriend.[3] Although she denied having a mental illness and also denied having any thoughts of harm towards herself or others, appellant was held on a psychiatric hold.
Later that same day, on October 9, Port of Portland Police Officer Hemsworth received a call regarding appellant, who was inside the airport, at a security checkpoint, wearing hospital scrubs and no shoes. Hemsworth had difficulty communicating with appellant because "[t]here was clearly some form of a language barrier" and because appellant appeared confused and disorganized in her thinking. Appellant told Hemsworth that she was attempting to fly to Arizona to get her baby, but she was not carrying any identification, a plane ticket, or any means to procure a plane ticket. Appellant was also not able to answer Hemsworth's questions about what day it was, where she was, her address, her date of birth, or when she had last eaten, and "had no plan to get anywhere other than to Arizona." Appellant did tell Hemsworth that she did not want to go back to the hospital because "she believed that she would die or they would kill her there."
Eventually, Hemsworth was able to identify appellant based on the hospital bracelet she was wearing. Hemsworth ultimately determined that appellant was unable to care for herself and was a danger to herself, and he took her to Portland Adventist hospital in Portland.
Monaco interviewed appellant again at the hospital a few days later. Appellant indicated that she had fled to the airport because "it wasn't safe" for her to be at Providence and that she had believed that her child and B. had moved to Minnesota  in fact, they were still living in Portland  that she was supposed to follow them there, and that the "voices told her that she wouldn't need identification or money to board a plane."
At the commitment hearing, the state presented the testimony of Hemsworth and admitted the nonhearsay portions of Monaco's precommitment report, which recounted the facts above. B. and Goss, a Department of Human Services (DHS) worker, also testified for the state.
B., who spoke through a translator, testified that he and appellant lived together and that appellant's behavior had started to change about three months before the commitment hearing and had appeared to become progressively worse in the weeks before the hearing. B. explained that appellant would accuse him of making statements when he had not, in fact, said anything and that she thought she could hear other people talking about her when they were in a separate car or when she was in their home.[4]
*700 B. also testified that appellant had abruptly quit her job a few weeks before the commitment hearing. When B. asked appellant about why she had quit her job, she responded, in part, that she planned to go to another state because "[e]verybody is after me."
On October 2, B. took appellant to see a doctor because he was concerned about her hearing voices and was afraid that she might harm their child. However, after they had checked in and were waiting, appellant ran out to the hospital parking lot. She told B. that she had run away because she "need[ed] to go to another state" and that she did not want to talk to the doctor or nursing staff. Afterwards, appellant and B. returned home.
On October 7, B. returned home from work to find that appellant and their child were missing and that they had been taken to Providence. B. testified that, when he first saw appellant at Providence that evening, she did not want to see him or her father and that she seemed confused. After appellant was hospitalized at Portland Adventist two days later, on October 9, she still seemed angry and confused and held B. and her father responsible for her being "in jail" at the hospital.
Goss, the DHS worker, interviewed appellant the day before the commitment hearing. Goss reported that appellant admitted that she had always heard voices, but claimed that they had only become "negative" since she and B. had gotten involved. She also denied having a mental illness and indicated her desire to be released from the hospital.
Appellant testified regarding the events of October 7 and October 9. With respect to the former, she stated that she was running away from her father  who, she said, was pressuring her to stay with B, when she fell on October 7  but later stated that she ran away because it "smelled like a dead body just left the house" and that her "child [was] wearing clothes all full of blood." As to the incident on October 9, appellant stated that a "voice," perhaps belonging to "the devil," had told her that "[s]omebody will kill you, and you better leave this state and go somewhere else." Appellant denied having a mental illness and claimed that her plan, upon release, was to pray and "live through God."
Both of the mental health examiners testified. Dr. McCubbin rendered the opinion that appellant suffered from a mental disorder and that she was a danger to herself and unable to provide for her basic needs. McCubbin testified that appellant was a danger to herself "only in the sense of putting yourself in difficult situations like going to the airport to fly out someplace * * * and not fully clothed, and expect to get on an airplane, which is unreasonable." Dr. O'Malia agreed that appellant suffered from a mental disorder (schizophrenia) and that the disorder caused delusions and hallucinations that appellant "responds to * * * very strongly, very impulsively, unpredictably and irrationally." O'Malia also concluded that that disorder rendered appellant unable to provide for her basic needs, but determined that appellant was only a danger to others, and not a danger to herself.
The trial court determined that appellant had a mental disorder and, because of that disorder, was a danger to herself. The trial court explained:
"[W]hat concerns me most about her circumstances in this case is the command hallucinations and her response to them. And I have in the record at least three times in which she's responded to the voices in her head, such that have placed herself in what I consider harm's way * * *.
"Once was when she * * * became frightened by the voices and took off running and fell. She was injured at that point.
"She heard voices when she was at the hospital on the [9]th of October, voices telling her that she wasn't safe at Providence, that she should flee, and she fled.
"She then heard voices to tell her that the father was taking the child to another state and she needed to go and follow and get the child. And so she got herself on MAX * * * got on without paying for a *701 ticket, and took it out to the airport, at which point she's stymied because she can't go any further.
"But I find [that] placed her at risk. She's out there, confused, disorganized, unable to provide any identifying information to people wanting to help her.
"And so I believe that these threeat least these three incidents, there's also the fleeing from the doctor's office. I don't know what was going on at that point, there was not enough information to know if that was based on voices. But I believe * * * at this point in time she responds very unpredictably and impulsively to the * * * command hallucinations and she's established a pattern of doing so, and that I believe that untreated she'll likely follow that pattern again and will again place herself in harm's way."
The trial court committed appellant to the Oregon Health Authority for a period not to exceed 180 days.
On appeal, appellant does not contest that she has a mental disorder, but she argues that the trial court's determination that she was a danger to herself rests on insufficient evidence. In particular, appellant contends that "there was no evidence that she placed herself in imminent danger by fleeing a situation that she perceived as dangerous." The state counters that the trial court correctly determined that appellant was a danger to herself because the incidents in which appellant fell and injured herself and in which she traveled to the airport either "resulted in harm or created situations likely to result in harm. State v. [Judd], 206 Or.App. 146, 152, 135 P.3d 397 (2006)." (Internal quotation marks omitted.) We conclude, for the following reasons, that the evidence of appellant's conduct, viewed most favorably to the state, is legally insufficient to support a determination that appellant was a danger to herself for purposes of ORS 426.005(1)(e)(A).
Generally, a person may be involuntarily committed if the person is found to be "mentally ill." ORS 426.130(1)(b)(C). As relevant here, a person is "mentally ill" if the person has a "mental disorder" and, as a result of that disorder, "is * * * [d]angerous to self * * *." ORS 426.005(1)(e)(A). Although historically reviewed de novo, our cases have uniformly imposed a rigorous threshold with respect to what the state is required to show to establish that an individual is "[d]angerous to self," ORS 426.005(1)(e)(A), as a matter of law.
To establish that a person is "[d]angerous to self," the state must present evidence that the person's "mental disorder would cause him or her to engage in behavior that is likely to result in physical harm to himself or herself in the near term." State v. Olsen, 208 Or.App. 686, 691, 145 P.3d 350 (2006). That requires evidence that the person's mental disorder "has resulted in harm or created situations likely to result in harm" in the "near future." Id. (internal quotation marks omitted). Additionally, our cases have established that the threatened "harm" must, at minimum, involve "actual physical harm," id. at 693, 145 P.3d 350, and that the physical harm must be "serious," State v. North, 189 Or.App. 518, 525, 76 P.3d 685 (2003). See also Judd, 206 Or.App. at 153, 135 P.3d 397 (discussing standard for "harm"). Indeed, a number of our cases have suggested that the potential harm must be "life-threatening" or involve some "inherently dangerous" activity. Judd, 206 Or.App. at 153, 135 P.3d 397 (noting case law) (internal quotation marks omitted).
In a related sense, we have explained that "a person can be deemed dangerous to self if he or she has established a pattern in the past of taking certain actions that lead to self-destructive conduct, and then he or she begins to follow the pattern again." State v. Roberts, 183 Or.App. 520, 524, 52 P.3d 1123 (2002). Consistently with that understanding, although a person can be committed on the "danger to self" basis before he or she is on the "brink of death," the prospect of serious physical harm must be more than merely "speculative." Id. (internal quotation marks omitted). Indeed, we have repeatedly admonished that "`apprehensions, speculations and conjecture are not sufficient to prove a need for mental commitment.'" Id. (quoting State v. Ayala, 164 Or.App. 399, 404, 991 P.2d 1100 (1999)) (brackets omitted). See also Olsen, 208 Or.App. at 691, 145 P.3d 350 (quoting Roberts, Ayala, and similar language *702 from State v. Stanley, 117 Or.App. 327, 330, 843 P.2d 1018 (1992)). Such restraint comports with the fundamental principle that the power to civilly commit a person must not be used "as a `paternalistic vehicle' to `save people from themselves.'" Olsen, 208 Or.App. at 692, 145 P.3d 350 (quoting State v. Powell, 178 Or.App. 89, 95, 35 P.3d 1084 (2001)). Accordingly, "delusional or eccentric behavioreven behavior that may be inherently riskyis not necessarily sufficient to warrant commitment." Id. at 691, 145 P.3d 350.
Our decisions addressing putative "danger to self" commitments based on "harm's way" concerns highlight the proper application of the foregoing legal principles. For example, in Olsen we held that evidence that the appellant, who suffered from delusions, had "poor judgment," and had a tendency to "travel aimlessly" and to "walk into people's homes" was insufficient to establish the requisite danger to self. 208 Or.App. at 689, 690, 145 P.3d 350 (internal quotation marks omitted). In so holding, we observed:
"Evidence of delusions, general lack of judgment, and failure to plan for release, * * * is simply not the kind of evidence of a particularized, near-term threat that is required to justify [the] appellant's involuntary commitment on the ground that he is a danger to himself."
Id. at 693, 145 P.3d 350.
Similarly, in Powell, we concluded that the facts that the appellant lacked self-control, had lost a significant amount of weight, and had repeatedly hit her head against a Plexiglass divider separating the front and back seats in a police car, was insufficient to sustain a commitment based on danger to self. We emphasized that, "[t]here is no evidence that appellant's poor judgment and lack of self-control have resulted in harm, so we are left to speculate about how her condition might lead her to harm herself in the future." 178 Or.App. at 94, 35 P.3d 1084. See also Roberts, 183 Or.App. at 522, 525, 52 P.3d 1123 (concluding that, although the appellant had "wander[ed] the streets in a confused state of mind" when not on her medication and, while in that state, had "`stepped off the curb' some unspecified number of times at some unspecified times in the past," where there was no evidence that she had ever been injured or in peril, the record was insufficient to establish a danger to self) (brackets in Roberts omitted).
We fully appreciate that each of those cases was subject to de novo review. Nevertheless, our disposition in each instance ultimately derived from legal principles that apply and control regardless of the standard of appellate review pertaining to the predicate facts. Specifically, the requisite danger to self cannot be based on mere unsubstantiated apprehension or speculation. Rather, it must partake of a "particularized," Olsen, 208 Or. App. at 693, 145 P.3d 350, and "highly probable," North, 189 Or.App. at 525, 76 P.3d 685, threat to appellant's safe survival, including a risk of substantial harm, in the near future.
Applying those fixed principles, the record in this case was legally insufficient to support commitment based on "[d]anger[ ] to self." Here, the evidence establishes that appellant had a pattern of "unpredictably and impulsively" running away when the voices she hears tell her that she or her child is in some kind of danger. On at least three occasions, apparently guided by her command hallucinations, appellant ran away: first into a parking lot on October 2, then when she fled from her home on October 7, and finally when she escaped from Providence on October 9 and traveled to the airport with the aim of flying to Arizona. Additionally, because of her mental disorder, appellant was "out there, confused, [and] disorganized," and, at least on one occasion, was "unable to provide any identifying information to people wanting to help her." The trial court was concerned that, given that history, appellant would eventually place herself in "harm's way."
However, as our cases have consistently emphasized, this sort of "delusional or eccentric behavior" that appellant manifested, even if "inherently risky * * * is not necessarily sufficient to warrant commitment." See Olsen, 208 Or.App. at 691, 145 P.3d 350. Appellant's conduct in "unpredictably and impulsively" running away is not materially different from conduct that we have repeatedly held was insufficient to support civil commitment on a "[d]angerous to self" basis. *703 See id. at 692-93, 145 P.3d 350 (reversing civil commitment where evidence showed that the appellant exercised "poor judgment" and had a tendency to "travel aimlessly"); Roberts, 183 Or.App. at 522, 52 P.3d 1123 (reversing civil commitment where the appellant "wander[ed] the streets in a confused state of mind"). Further, nothing in the evidence establishes that appellant's "unpredictable" and "impulsive" behavior resulted in any serious harm or substantial proximate risk of such harm, much less that a reoccurrence of such conduct will present a nonspeculative risk in the near future. Although appellant was physically injured when she tripped and fell while responding to the command hallucinations that told her to flee with her child, her resulting injurysome "cuts, abrasions and discolored swelling * * * on her left che[e]k and above her left eye"was not the sort of "serious," much less" life-threatening," harm that our cases have required. See, e.g., North, 189 Or.App. at 525, 76 P.3d 685 (evidence failed to show the appellant suffered "any serious harm"); State v. Turel, 182 Or.App. 235, 242, 48 P.3d 175 (2002) (evidence insufficient to show how the appellant's conduct "could present a life-threatening condition").
In sum, the record in this case is legally insufficient to support a determination that, as a result of her mental disorder, appellant was "[d]angerous to self," ORS 426.005(1)(e)(A).
Reversed.
NOTES
[1] As we recently explained in D.R., although we have historically reviewed civil commitment cases, like other equitable proceedings, "anew upon the record," ORS 19.415(3) (2007), amended by Or. Laws 2009, ch. 231, § 2, the legislature modified that statute to change our standard of review for cases  like this one  in which the notice of appeal was filed on or after June 4, 2009. 239 Or.App. at 578, 244 P.3d 916. See generally DHS v. Three Affiliated Tribes of Fort Berthold, 236 Or.App. 535, 538-39, 238 P.3d 40 (2010) (discussing amendment). ORS 19.415(3)(b) now provides that, "[u]pon an appeal in an equitable action or proceeding * * * the Court of Appeals, acting in its sole discretion, may try the cause anew upon the record or make one or more factual findings anew upon the record." (Emphasis added.)
[2] Pursuant to a temporary amendment to ORAP 5.40, the Court of Appeals will exercise that discretion only in "exceptional cases." ORAP 5.40(8)(c). Here (notwithstanding that the notice of appeal was filed on November 9, 2009), it appears that appellant erroneously assumed that our standard of review was de novo and did not request that we exercise our discretion to review de novo, much less explain why we should do so. Absent such a request and justification, and given the "presumption against the exercise of discretion" to engage in de novo review, ORAP 5.40(8)(c), we do not engage in such review.
[3] Appellant said that she knew about the girlfriend because she had heard voices from "outside" talking about her and that the voices had shown her the girlfriend "in the distance."
[4] B. also testified regarding appellant's interactions with their child, some of which involved conduct that was arguably unsafe. However, the trial court ultimately declined to predicate commitment on a "danger to others" ground based on that alleged conduct, and the state does not urge "danger to others" as an alternative basis for affirmance.