Argued and submitted December 6, 2012, affirmed January 30, petition for
review allowed June 20, 2013 (353 Or 747)

In the Matter of A. J. C.,
a Youth.

STATE OF OREGON,
*Respondent,*

*v.*

A. J. C.,
*Appellant.*

Washington County Circuit Court
J100537;
Petition Number 04J100537;
A147559

295 P3d 1157

Christine Obold-Eshleman argued the cause and filed
the brief for appellant.

Matthew J. Lysne, Assistant Attorney General in Charge,
Criminal Appeals, argued the cause for respondent. On
the brief were John R. Kroger, Attorney General, Anna M.
Joyce, Solicitor General, and Samuel A. Kubernick, Assistant
Attorney General.

Before Armstrong, Presiding Judge, and Duncan, Judge,
and Brewer, Judge pro tempore.

BREWER, J. pro tempore.

## BREWER, J. pro tempore

In this juvenile delinquency proceeding, youth appeals from a judgment finding him within the jurisdiction of the juvenile court for conduct that, if committed by an adult, would constitute possession of a gun in a public building, ORS 166.370, unlawful possession of a gun, ORS 166.250, unlawful use of a weapon, ORS 166.220, and menacing, ORS 163.190. Youth advances three assignments of error, two of which we reject without discussion. In his remaining assignment of error, youth asserts that the juvenile court erred by denying his motion to suppress a handgun and ammunition found during a search of his backpack by the school principal, because that search violated youth's rights under Article I, section 9, of the Oregon Constitution.[1] We affirm.

We recount the material facts in accordance with the trial court's findings.[2] On the evening of September 22, 2010, youth called and sent a text message to V, also a student at the school, and told her that he was going to bring a gun to school the next day and shoot her. The next morning, V reported youth's threat to Glader, a school counselor, who, in turn, informed the school's principal, Smith. Glader also told Smith that she believed that there might have been threats to other students, but she did not specifically identify those students. Smith testified that Glader had been at the school for three years and that he had worked closely with her. Although Smith had not personally met V, he testified that there had been "no indication[s] of any previous problems" with her. Smith was familiar with youth, who had had "disciplinary issues." Smith had worked closely with youth and his family to resolve those issues. Although the idea of youth threatening to bring a gun to the school and shooting another student was "something that was outside the realm

---

[1] Article I, section 9, of the Oregon Constitution provides, in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search, or seizure[.]"

[2] Although youth notes that we have discretion to review this case *de novo*, he has not demonstrated that this is the kind of "exceptional case" that would justify such review. ORS 19.415(3)(b); ORAP 5.480(c). Accordingly, we decline to exercise our discretion to review *de novo* and, instead, are bound by the trial court's findings of historical fact that are supported by evidence in the record. *State v. B. B.*, 240 Or App 75, 77, 245 P3d 697 (2010).

of what [he] thought could happen," Smith testified that it was "not an option in my job to disbelieve it until it's—till I find out the information."

Smith called Deputy Sheriff Chertrude to assist with the investigation. Smith also called youth's mother, who came to the school as well. While waiting for youth's mother to arrive, Smith searched youth's locker; he did not find a gun there. After Chertrude and youth's mother arrived, Smith went to youth's classroom. Youth was seated at a desk, and his backpack was underneath the desk, but within his reach. Smith picked up youth's backpack and escorted him to Smith's office. Youth's mother and Chertrude joined youth and Smith in the office. A friend of youth's family also was present. Smith told youth that "[w]e had a student that said you were going to bring a gun to school and shoot them today and that that threat happened last night over a series of either text or phone calls." Youth denied making the threats. Smith asked youth why V would make up such a threat, and he told youth that he had "a hard time believing a new student to our building is just going to make up a story, so I have to take it seriously. I don't have any reason to believe that she's lying to me, so what happened?" Youth then admitted to having had some sort of relationship with V.

As the interaction in the office unfolded, the backpack was lying beneath Smith's desk, near his feet, and had been under Smith's control since he took it from under youth's desk in the classroom. After about five or six minutes of conversation, Smith told youth that, "with this kind of verbal threat, I need to check and see * * * if this is true or not. So I have to follow through in my processes here, so I'm going to search your backpack." Youth neither objected nor consented to the search, and Smith opened the backpack. The backpack had five or six compartments, and Smith began by opening the largest compartment; it contained only books. Smith then opened a second compartment, which was about eight inches long and eight inches wide, where he found several rounds of .45 caliber handgun ammunition. Smith then unzipped another compartment that was large enough to hold a textbook or a pair of shoes, and he found a .45 caliber semi-automatic handgun wrapped in a bandana.

Chertrude took the gun from Smith and determined that it was not loaded. Chertrude then placed youth in handcuffs and read him his *Miranda* rights.

At a pretrial hearing, youth moved to suppress the handgun and ammunition, arguing that Smith had violated his Article I, section 9, rights by searching his backpack. Relying on the Supreme Court's decision in *State ex rel Juv. Dept. v. M. A. D.*, 348 Or 381, 393, 233 P3d 347 (2010), youth argued that Smith had not received "credible information, based on specific and articulable facts," regarding the threat, and, thus, did not have reasonable suspicion to believe that he would find a weapon in the backpack. Youth also argued that there had been no "immediate threat" justifying a warrantless search of the backpack because, after Smith seized it, youth no longer could reach the handgun.

The juvenile court denied youth's motion. The court explained:

"[Smith] has a report from a student that was identified by name, that the youth, also identified by name, was bringing a * * * gun to school to harm another student today. Not only is the person making the report named specifically, the youth is named specifically. Not only is the time current—the gun is coming to school today—from a report made last night, but the report of the specific type of threat is identified: bringing a gun to school to shoot her. Each and every one of those facts is very specific in terms of the threat.

"* * * * *

"[Smith] * * * asked [youth] about the report, and although [youth] denied making the threat, denied bringing this gun to school, he acknowledged that he knew who the reporter was and acknowledged that there was a relationship. So that can tell the principal reasonably that the report has some merit, some basis. It is not one that is without merit or truly fanciful. And subsequently, the principal conducts a search and finds first the bullets and then the gun.

"I would note that in the course of the search, that search took a very specific process. The [principal] did not search small or tiny compartments. He searched compartments in the backpack that would reasonably hold an item that was

alleged to have been brought on the campus: a gun. So he didn't open small containers or examine small containers. He opened portions of the backpack that would reasonably contain a weapon.

"And first he finds the bullets. That gives him a reason beyond any kind of common sense to believe that the other compartments might hold a gun, because bullets, of course, have no value without a gun. And, of course, in the very next compartment, he finds a gun. So stated in short, that search was no further intrusive than it needed to be.

"* * * * *

"For all those reasons, the court finds that the principal did have a reasonable suspicion that there w[ere] imminent health or safety threats or risk to the students of the school, and had a right, under the Oregon and United States Constitution, to conduct that search of the backpack."

Following a trial, the court found youth to be within its jurisdiction. This appeal followed.

On appeal, youth asserts that, because Smith testified that youth bringing a gun to the school was "something that was outside the realm of what [he] thought could happen," Smith lacked reasonable suspicion to conduct the search. Youth further argues that, even if Smith reasonably suspected that a gun was inside the backpack, the warrantless search exceeded the scope of the "school exception" to the warrant requirement of Article I, section 9, that the Supreme Court articulated in *M. A. D.*, because Smith's seizure of the backpack removed any immediate threat to the safety of other students and staff at the school.

Warrantless searches of students without probable cause or some other exception to the warrant requirement, such as consent, are permissible when a school official reasonably suspects, based on specific and articulable facts, that the student is in possession of something that poses an immediate threat to the student or others. *M. A. D.*, 348 Or at 392-93; *State v. B. A. H.*, 245 Or App 203, 210, 263 P3d 1046 (2011). In developing reasonable suspicion, "a school official may not rely on generalizations about [a student's activity] or on information that is not specific or current." *M. A. D.*, 348 Or at 393. In this case, youth did not consent

to the search of the backpack, and the trial court did not conclude that Smith had probable cause to believe that youth had a gun inside his backpack so as to support the issuance of a warrant to search the backpack.[3] Thus, the dispositive question is whether, before searching the backpack, Smith reasonably suspected, based on specific and articulable facts, that the backpack contained a weapon that posed an immediate threat of harm to V or others at the school.

Applying the Supreme Court's analysis in *M. A. D.*, we answer that question affirmatively. V told Glader that youth had threatened her on the evening of September 22. On the morning of September 23, Glader told Smith that youth had threatened V and had also specified the manner in which he would harm V; that is, by bringing a gun to the school to shoot her. Although Smith testified that youth's threat was "something that was outside the realm of what [he] thought could happen," he testified that, it was "not an option in [his] job to disbelieve [the threat] until it's—till [he found] out the information." Moreover, although Smith did not personally know V, he had worked closely with Glader, from whom he learned of youth's threat. In its totality, that information was sufficient for Smith to reasonably suspect that youth had brought a gun to the school for the purpose of harming V or others.

We turn to youth's alternative argument that the search of his backpack was unlawful because its seizure had dissipated any immediate threat to school safety. In *M. A. D.*, the court analogized a school setting to circumstances involving the "officer-safety exception" to the warrant requirement of Article I, section 9. As the court explained:

> "Under the officer-safety exception, a police officer may take 'reasonable steps'—including a limited search—to protect the officer or others if, 'during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present.' ***

---

[3] Neither party argues on appeal that there was probable cause to issue such a warrant based on the information that Smith had at the time of his search.

"*****

"* * * [T]he officer-safety exception requires reasonable suspicion of an immediate threat of serious physical injury to the officer or others, based on specific, articulable facts. In assessing whether an officer's actions are permitted based on those facts, the court 'asks only whether safety precautions chosen by the officer were reasonable under the perceived circumstances.' Because such 'reasonable steps,' which may include at least a limited search, do not violate Article I, section 9, evidence of wrongdoing obtained as a result of the search will not be suppressed.

"* * * As persons responsible for maintaining a safe learning environment, when school officials perceive there to be an immediate threat to student or staff safety at a school, they must be able to take prompt, reasonable steps to remove that threat. As with an officer-safety search, when a school official develops a 'reasonable suspicion,' based on 'specific and articulable facts,' that a particular individual on school property either personally poses or is in the possession of some item that poses an 'immediate threat' to the safety of the student, the official, or others at the school, the school official 'must be allowed considerable latitude to take safety precautions.'"

*M. A. D.*, 348 Or at 391-93 (citations omitted).

In short, the scope of a permissible school-safety search is determined by what is reasonable under the perceived circumstances, which, in turn, "depends on the nature of the safety threat." *Id.* at 392 n 5. For example, a "reasonable suspicion that the person searched is carrying a rifle" would "not ordinarily be sufficient to justify a strip search of the person or a search of the person's wallet." *Id.*

In *State v. Gilkey/White*, 172 Or App 95, 18 P3d 402 (2001), a police officer stopped a vehicle. The officer suspected that the occupants possessed methamphetamine. The officer seized, and subsequently searched, a closed tube of "chapstick" because he suspected that it might conceal a weapon. *Id.* at 97-98. In concluding that the search violated the defendant's Article I, section 9, rights, we explained that, "[o]nce the officer had seized the [container], he no longer had any reason to believe that it still posed a threat to him[,]" and, thus, "no immediate officer safety concern

justified" the officer's warrantless search. *Id.* at 104 (internal quotation marks omitted). Relying on *Gilkey/White*, youth asserts that, when Smith seized the backpack in this case, any threat to safety had dissipated. We disagree.

The court in *M. A. D.* noted that "we do not mean to suggest that the officer-safety doctrine and a school official's search of a student * * * are identical in all respects." 348 Or at 393. In particular, the court emphasized that "the public school setting and the obligation of school officials to provide a safe learning environment requires that they be able to respond quickly to credible information * * * about immediate threats." *Id.* Because the dispositive inquiry is what is reasonable under the perceived circumstances, fact matching from decisions involving markedly different circumstances is of little utility.

Here, Smith was confronted with an immediate threat both to a named student and to the general safety of the school. As noted, Glader told Smith that, in addition to V, youth might have threatened other, unidentified students. Smith did not know the type or size of the gun that youth reportedly had brought to school or the manner in which youth possessed it. That is, Smith did not know whether youth was carrying the gun on his person, had the gun in his backpack, or had concealed it somewhere else inside the school.[4] Thus, Smith was faced with the choice of returning the unopened backpack to youth, his mother, or the family friend, searching elsewhere in the school, or searching youth's person. Smith chose to search the backpack, and, in light of the other options, that choice was reasonable; it was the most likely to reveal a gun and dissipate the safety threat without further intrusions or delay. For those reasons, in light of the nature of the safety threat, Smith's decision to search youth's backpack was reasonable.

Affirmed.

---

[4] As noted, Smith had searched youth's locker before contacting him in the classroom. Youth does not challenge the validity of that search.