273 P.3d 341 (2012)
248 Or. App. 481
In the Matter of R.E., Alleged to be a Mentally Ill Person.
STATE of Oregon, Respondent,
v.
R.E., Appellant.
C090057MC; A143452.
Court of Appeals of Oregon.
Argued and Submitted April 11, 2011.
Decided March 7, 2012.
*342 Susan D. Isaacs, Beaverton, argued the cause and filed the brief for appellant.
Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. On the brief were John R. Kroger, Attorney General, Mary H. Williams, Solicitor General.
Before ORTEGA, Presiding Judge, and BREWER, Chief Judge, and SERCOMBE, Judge.[*]
BREWER, C.J.
Appellant appeals from a judgment of involuntary civil commitment, arguing that the state failed to prove by clear and convincing evidence that he was, because of a mental disorder, a danger to himself and that he was unwilling to voluntarily participate in treatment. ORS 426.130. Whether the state presented sufficient evidence to support a civil commitment is a question of law. State v. B. B., 240 Or.App. 75, 77, 245 P.3d 697 (2010).[1] We are bound by the trial court's findings of historical fact that are supported by any evidence in the record; we further review the court's dispositional conclusions, predicated on those findings, for errors of law. State v. D.R., 239 Or.App. 576, 578, 244 P.3d 916 (2010).
At the time of the hearing, appellant was 38 years old and had recently left his job of 10 years as a medical technician. Appellant's supervisor testified that appellant had worked at a Providence hospital and that she had known him for two years. The supervisor testified that appellant had quit and told her that he wanted to move to Florida and start a new life; appellant also told her that his relationship with his significant other, M.L., "had changed," though he did not disclose any details. The supervisor testified that, in the months before appellant quit his job, his performance had deteriorated, and she had become suspicious that appellant was "either on drugs, alcohol, or [had] some sort of a gambling issue [that was] going on, because [his] behavior [was] increasingly erratic."
On the morning of August 27, the supervisor called appellant because she suspected that he had been forging prescriptions for narcotic pain medication. She told appellant that she knew of two prescriptions, including one for 90 Percocet pills, that appellant had passed at a local pharmacy. The supervisor ultimately told appellant that she suspected that he had used seven forged prescriptions for various amounts of narcotic pain medication. Appellant asked the supervisor not to call the police, and when she told him that she had no choice but to involve them, appellant said: "Then my life is over. My life is *343 over today" and "My life is over. I'm not going to be alive by the end of the day." The supervisor testified that she "felt that [appellant] was going to commit suicide." She called the police and alerted them to her concern.
Officer Phillips went to appellant's home that morning in response to the supervisor's call. He found appellant outside the home, next to his car. He told appellant that he was there because "we are concerned with his safety, that there was a call regarding that he might hurt himself." The officer testified that appellant told him "that he was very scared regarding avery scared about what might happen to him regarding a Portland Police case" and that he had told appellant that "we are not there for that, we were only there concerned with his safety at this point." The officer testified that appellant then told him, "I think I want to hurt myself." Appellant consented to a search of his person, and Phillips found a vial of Propofol,[2] two syringes, and a small bottle of pills. Phillips testified that "[appellant] told me he was thinking about using them to harm himself." According to Phillips, "[appellant] repeatedly told me he was scared of what might happen to him, and he repeatedly told me that he was afraid of what he might do to himself." Phillips then transported appellant to the hospital. Before they left appellant's home, appellant and M.L. had asked Phillips if they could get a document notarized; that document, which appellant had written, signed over the title of his car and his bank and retirement accounts to M.L. The officer told appellant that it was not possible to do so, and he transported appellant to the hospital.
A civil commitment investigator, Rogers, testified that he met with appellant "four or five times" while appellant was in the hospital. Rogers diagnosed appellant with an "adjustment disorder with mixed anxiety and depressed mood." Rogers explained that, according to the DSM-IV:[3]
"An adjustment disorder is a maladaptive response to an identified event, stressor, or series of events or stressors that occur within three months of that particular stressor. It's something that causes severe problems in terms of his general functioning, in terms of his occupational functioning, social functioning, and his executive decisions[.]"
Rogers testified that he met with appellant on August 28; appellant told him that "he had made a bad decision, that it was pretty much the result of having just one very bad day. He stated he did not feel suicidal, that he hadn't really said that he was suicidal, and that he wanted to be released from the hospital." Rogers testified that appellant had refused to sign releases for his medical records and so that Rogers could contact "collateral witnesses." In Rogers' view, appellant's refusals demonstrated that he was unwilling to comply with treatment. Rogers testified that, when he met with appellant on August 28, "he wasappeared extremely anxious. He was sweating. Hehis speech was somewhat pressured. He looked terribly, terribly anxious at that point in time, and did not look, in my opinion, in control of himself."
Rogers also met with appellant on August 31; appellant again denied having been suicidal and said that "it was all a misunderstanding, said he nevernever meant to harm himself, and once again, described this as like one really bad day." According to Rogers, appellant "seemed overly bright. I mean, in terms of his affect, in terms of his general presentation, as if, you know, he everything waswas fine, while still appearing extremely anxious, andand not really in control of himself."
*344 Rogers eventually was able to interview appellant's supervisor and Phillips, and he determined that appellant's version of events was inconsistent with their versions. Ultimately, Rogers concluded that appellant was a danger to himself at the time of the hearing, explaining:
"He's been resourceful enough to, as I understand it, acquire a large quantity of medication. He was resourceful enough to have this bottle of Propofol, and prescriptions. And he did tell me that he was getting ready to leave the house, to take the Propofol and the syringes to the hospital to dispose of them, so hehe was getting ready to leave. So he had deadly means on him. He's getting ready to leave the scene. He stated the only reason he wasn't able to leave the scene was because the police got there too fast. He's extremely resourceful.
"And, as far as I know, thosethat stockpile of medications that he was able to get are unaccounted for. So II feel those are still there, I feel he still has access to that. I don't feel that anything has changed in terms of his situation, and I feel he's at grave risk to leave and imminently kill himself."
M.L. testified that the end of her intimate relationship with appellant had been amicable, that they remained friends, and that appellant would continue to live with her until he could move to Florida to be closer to his parents. M.L. denied ever having heard appellant threaten to take his own life, and she opined that he was not a danger to himself. She also denied knowing that appellant was addicted to narcotic pain medication, but stated that she knew he took such medication for injuries that he had suffered in the past. M.L. testified that appellant had signed his car and bank accounts over to her because he was concerned that he would be arrested, and he wanted her to have money to hire a lawyer and bail him out of jail.
Appellant also testified. He denied having told the supervisor that his "life was over," and he also denied telling the Phillips that he was worried that he would harm himself. Appellant stated that he did not presently want to harm himself and denied ever having wanted to harm himself. Appellant testified that, after their break up, he and M.L. remained best friends. Appellant also stated that he had quit his job because he intended to move to Florida to be closer to his parents and that he and M.L. were planning a road trip across the country for that purpose. Appellant denied having possessed Propofol in order to commit suicide; he told the court that he had inadvertently taken it home and that he had it in his pocket when he was searched because he intended to take the vial and needles to the hospital for disposal in a "sharps container." Appellant explained that he had signed over his car and bank accounts to M.L. because he feared that he would be arrested and wanted M.L. to have enough money to hire an attorney and bail him out of jail. Appellant also testified that, although the accounts had no money in them at that time, he was expecting a disbursement of retirement funds within a few weeks.
Appellant explained that he had initially refused to sign releases for his medical information because he was worried about his privacy. Appellant stated that "I just wanted my former co-workers to not be able to view what I was going through, especially the ones that I didn't know[.]" Appellant told the court that, while he was at the hospital, he had sought placement in an outpatient treatment program outside the Providence system. Appellant also denied being addicted to narcotic pain medications; he asserted that he had only used medications that were prescribed to him for prior injuries.
Dr. O'Malia, one of the examiners at the hearing, and another mental health examiner, Walker, submitted written reports to the trial court after the testimonial portion of the commitment hearing. O'Malia opined that, during the hearing, appellant's "face was impassive in general, although he appears somber. When he spoke he was clearly tense, angry at the situation." O'Malia considered appellant's speech to be "fluent, slightly pressured," and opined that appellant made a "defensive presentation, discount[ing] the impact of his behavior." According to O'Malia, appellant was "unable to explain why lethal drugs were stored in his home, not destroyed *345 or returned to [the] hospital." O'Malia diagnosed appellant with an "adjustment disorder with mixed anxiety and depressive mood," concluded that he was a danger to himself based on the "highly lethal means chosen," and identified as stressors the "sudden, irrevocable loss of profession." O'Malia recommended that appellant be kept in a secure facility "while mood and chemical dependency issues are dealt with."
Walker also diagnosed appellant with an "adjustment disorder with mixed anxiety and depressed mood." Walker concluded that appellant was a danger to himself because "[he] appears to face virtually the same constellation of stressors vs. supports that existed prior to his hospitalization." It was likely, Walker concluded, "that given an unchanged life situation that [appellant] will continue to react to his life situation in the same manner that he has been doing so which reflects a gradually escalating decline in functioning and stability including suicidal ideation, plan and intent." Walker also opined:
"There is substantial evidence to support a diagnosis of opioid dependence over the diagnosis of adjustment disorder. The larger description of behavior and events is much more consistent with a picture of an addiction issue as opposed to a reaction to stressors, even though the adjustment disorder is still relevant."
Walker recommended that appellant be committed because he "is clearly dealing with addiction issues that impair his judgment and impulse control and overall functioning. He would best benefit from treatment to address his addiction * * * [and] he is not likely to be motivated to do so."
The trial court committed appellant. The court explained that appellant's version of how he came to possess the Propofol and what he intended to do with it on the morning of August 27 "doesn't make logical sense * * *[.] You know, its the kind of thing where if you were not planning to use it, you'd probably just dump it down the toilet." The court continued:
"And then, you know, we've got his friend, [M.L.], you know, and she's clueless. I mean, here we've got these issues in terms of drug use. And, I agree with you, that's not something that I can use in terms of committing him. That can't be the reason for committing him, but it's a circumstance that plays into some of the other decisions the court has to make, in terms of if the court does find that there's a mental disorder, whether or not he's likely to follow through with voluntary treatment, or is capable of doing that, you know?
"And its interesting, you know, she's living with him, and she'sshe doesn't have any idea that this is going on. Okay? And that speaks, basically, to her ability to be a person who would care for him, because if she's not living with him, able to see those kinds of things and those problems while other people around him can see them, and see that, thatthat leaves the court in a position where maybe she's not the person who should have custody of him in that circumstance.
"And then the issue about thethe signing over all the property, and the car, andand the bank accounts that didn't have any money in them at the time, and might not have had any money in them for at least three weeks, you know, for the purported purpose of being available to bail him out of jailyou know, I can see maybe signing the car over, because if you have the title to the car at that particular point, you can convert it to cash, but, you know, what's the purpose of the bank accounts? There's no money there, and there isn't any money for at least three weeks, you know. And if that was something that was necessary, maybe that's something that can be done at a later point in time.
"And I will agree with you, you know, in terms of the fact that he's got future plans, and that he says he's not suicidal at this point, and that he can deal with all this and he'll get voluntary treatment. He said all those things on the record, but he also told the lady at work, you know, that this was only on one occasion, where there were seven, at least from her testimony that she was able to determine in terms of these prescriptions. And, you know, he wasn't honest with her as it relates to those *346 things, and I'm not sure that he's been honest with the court.
"* * * * *
"But, you know, his credibility is at issue here in this trial, in terms of things that the court has heard.
"And, you know, you talk about the stressors, and about, `well, he quit his job.' Well, that'scould be the sign of someone that's starting off anew in Florida, or it can be the sign of somebody that's giving up, you know?
"And stressors, you know, you're a person of interest in a criminal case in Portland. That's got to be a stressor. And, you know, basically, we've got the testimony of his boss. I mean, she was concerned enough that she called the police to come out to try and come see him, to make sure that he wasn't going to hurt himself, so he must have somehow left the impression with her, even though we may not know the exact words, that, in fact, he was going to end his life, because otherwise she would never have called the police. They would have never come to the house on that particular occasion, you know?
"You look at the whole thing here, and I am, and the examiners have come to the exact same conclusion that I have. I do find by clear and convincing evidence that he is a danger to himself, that he is suffering from a mental disorder. And, based upon the fact that he has these issues with substance abuse, that he would not cooperate and benefit from a program of voluntary treatment.
"I do believe that there are alternatives to him being committed to the care and custody of the Mental Health Division, but I'm not prepared on the basis of the information I have here to turn him over to [M.L.] at this point. I don't think that she's a proper person, for the reasons I've indicated.
"* * * * *
"Absent another person coming forward, II do commit him to the care and custody of the Mental Health Division for a period not to exceed 180 days. That's the court's ruling."
As noted, appellant argues on appeal that he was not suffering from a mental disorder at the time of the commitment hearing, that he was not a danger to himself, and that he was willing to voluntarily participate in treatment. A person may be involuntarily committed if the person is found to be "mentally ill." ORS 426.130(1)(b)(C). As pertinent here, a person is "mentally ill" if the person has a "mental disorder" and, as a result of that disorder, "is * * * [d]angerous to self * * *." ORS 426.005(1)(e)(A). Our previous decisions have uniformly imposed a rigorous proof threshold to establish that an individual is "[d]angerous to self," ORS 426.005(1)(e)(A).
"To establish that a person is `[d]angerous to self,' the state must present evidence that the person's `mental disorder would cause him or her to engage in behavior that is likely to result in physical harm to himself or herself in the near term.' State v. Olsen, 208 Or.App. 686, 691, 145 P.3d 350 (2006). That requires evidence that the person's mental disorder `has resulted in harm or created situations likely to result in harm' in the `near future.' Id. (internal quotation marks omitted). Additionally, our cases have established that the threatened `harm' must, at minimum, involve `actual physical harm,' id. at 693 [145 P.3d 350], and that the physical harm must be serious,' State v. North, 189 Or.App. 518, 525, 76 P.3d 685 (2003)."
B.B., 240 Or.App. at 82, 245 P.3d 697 (brackets in B.B.).
Although a person can be committed as dangerous to self before he or she is on the "brink of death," the prospect of serious physical harm must be more than merely "speculative." State v. Roberts, 183 Or.App. 520, 524, 52 P.3d 1123 (2002) (internal quotation marks omitted). "[T]he mere apprehension that a person may commit suicide is insufficient for commitment. Rather, the state must establish through the evidence that it is highly probable that an alleged mentally ill person will attempt to commit suicide in the near future," as a result of the *347 person's mental disorder. State v. C.R., 216 Or.App. 395, 400, 173 P.3d 836 (2007).
Several of our previous decisions have addressed the sufficiency of evidence that the appellant was a danger to self where he or she had made statements reflecting suicidal intent. As we stated in B.B.:
"We fully appreciate that each of those cases was subject to de novo review. Nevertheless, our disposition in each instance ultimately derived from legal principles that apply and control regardless of the standard of appellate review pertaining to the predicate facts. Specifically, the requisite danger to self cannot be based on mere unsubstantiated apprehension or speculation. Rather it must partake of a `particularized' * * * and `highly probable' * * * threat to appellant's safe survival, including a risk of substantial harm, in the near future."
240 Or.App. at 84, 245 P.3d 697. We have held that "a stated desire to die is insufficient by itself to prove the condition of `dangerous to self' by clear and convincing evidence." State v. N.A.P., 216 Or.App. 432, 438, 173 P.3d 1251 (2007). In State v. M.S., 180 Or. App. 255, 258, 42 P.3d 374 (2002), we reversed a judgment of commitment where the appellant had stated that she wanted to die but had not "attempted suicide lately." During her prehearing hospitalization, the appellant had shouted, "God, take my life, I don't care anymore," asserted that the medication being offered to her was harmful, and claimed that people were practicing witchcraft against her. Id. However, she testified that she was not experiencing any suicidal feelings or desires to hurt others at the time of the hearing. Two examiners testified that the appellant was a danger to herself because of her mental disorder, unpredictable and impulsive behavior, and noncompliance with her prescribed medication regime. We nevertheless held that the appellant's statements that she wished at times that she were dead did not constitute clear and convincing evidence that she was likely to attempt to take her own life in the near future. We explained:
"Defendant's statements that she wishes at times that she were dead are troubling from a perspective of a treating physician or counselor, but they do not rise to the level of clear and convincing evidence, as required by the statute, that she is likely to attempt to take her own life in the near future."
M.S., 180 Or.App. at 263, 42 P.3d 374.
In State v. Puha, 208 Or.App. 453, 465, 144 P.3d 1044 (2006), we held that evidence that a person had attempted suicide years earlier and had threatened to harm herself during a current symptomatic episode was insufficient to prove by clear and convincing evidence that she was dangerous to herself. Beyond her admission that she said that she wanted to harm herself, there was "no evidence by which to evaluate the seriousness and imminence of that threat." Given the appellant's testimony that she did not currently have a plan to harm herself, we concluded that her recent oral threat alone did not prove by clear and convincing evidence that she was an imminent danger to herself. Id.
In N.A.P., we reversed an order of commitment based on danger to self where the appellant was "involuntarily hospitalized" and "became uncooperative with hospital staff, was placed in restraints, and asked hospital staff to kill her." 216 Or.App. at 434, 173 P.3d 1251. We explained that,
"[a]lthough delusional behavior may be inherently risky, that behavior is not enough to warrant involuntary commitment unless danger to self is highly probable in the near future; mere speculation is not enough. Although appellant did exhibit a sense of hopelessness and increased desperation about her delusions, and expressed a wish that hospital staff would end her life, it is speculative whether appellant would actually attempt to take her own life.
"* * * * *
"Appellant has not attempted suicide in the past. She has lived with mental illness for many years without self-inflicted harm. * * * Standing alone, a statement that one wants to die or wants staff to kill one, especially with no history of suicide attempts, is not tantamount to an assertion *348 that one intends to inflict self-harm in the near future."
Id. at 439-40, 173 P.3d 1251.
Mindful of the principles set out in those decisions, we conclude that there was sufficient evidence in the record before us for a trier of fact to determine, by clear and convincing evidence, that appellant was suffering from a mental disorder at the time of the hearing that caused him to be a danger to himself. Importantly, we are bound by the trial court's finding that appellant's testimony was not credible in light of the testimony of the supervisor, the police officer, and the civil commitment examiner. Here, unlike in the cases discussed above, appellant had gone further than merely making verbal statements indicating suicidal tendencies. In addition, appellant had acquired a powerful sedative, a sedative that his supervisor testified was never used "without the patient on every monitoring device that we have." Although appellant denied having possessed the Propofol for the purpose of harming himself, the trial court discounted that testimony, concluding that appellant's version of events "doesn't make logical sense." Moreover, as the examiners noted in their reports, all of the stressors underlying appellant's adjustment disorder were still present at the time of the hearing. Appellant was possibly facing criminal charges arising from his alleged forgery of prescriptions, he faced the end of his career as a medical technician, and, crucially, in light of the examiners' conclusions that appellant had an opioid dependency, he could expect an end to his illicit access to narcotic pain medication. Further, the examiners opined that, in light of the number of prescriptions that appellant allegedly had forged, it was likely that he had stockpiled narcotic pain medications that he would have access to if released after the hearing.
The record demonstrates that the constellation of factors that the trial court found had driven appellant to possess the Propofol with the intent to commit suicide were still present at the time of the hearing. The trial court did not err in concluding that appellant was mentally ill under ORS 426.130 on the ground that appellant had a mental disorder that caused him to be a danger to himself. Furthermore, the trial court did not err in finding that appellant would not be willing and able to participate in voluntary treatment because of his chemical dependency. ORS 426.130(1)(b)(A)(i)-(ii). It follows that the trial court did not err by committing appellant.
Affirmed.
NOTES
[*] Brewer, C.J., vice Rosenblum, S.J.
[1] We have the discretion to review this case de novo, ORS 19.415(3)(b), and appellant has asked us to do so. However, we exercise our discretion to review de novo "only in exceptional cases," ORAP 5.40(8)(c). Because appellant has not identified any reason why this case is exceptional, as required by ORAP 5.40(8)(a), and we do not perceive one, we decline to review de novo. State v. D.R., 239 Or.App. 576, 579, 244 P.3d 916 (2010).
[2] Appellant's supervisor testified that Propofol is:

"An anesthetic agent. We use it in the Emergency Department for what we call deep sedation. * * * We use it to put people to sleep[.]* * * It's a very dangerous medication. It's a medication that we use very carefully. It's a medication that we never use without the patient on every monitoring device that we have."
The supervisor also testified that Propofol was "located in two separate places that I think [appellant] could access it" and that appellant "was an Emergency Department technician, and a very good one" and that he would have been familiar with what Propofol is used for.
[3] "DSM-IV" refers to the Diagnostic and Statistical Manual of Mental Disorders, (4th ed. 2000).