Submitted November 2, 2012, affirmed October 9, 2013

In the Matter of C. C.,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

C. C.,
*Appellant.*

Multnomah County Circuit Court
101071218; A146999

311 P3d 948

Rebecca Carter filed the brief for appellant.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Joanna L. Jenkins, Assistant Attorney General, filed the brief for respondent.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

WOLLHEIM, J.

**WOLLHEIM, J.**

Appellant appeals a judgment of involuntary civil commitment, contending that the record is insufficient to support the trial court's determination that he was a danger to self as a result of a mental disorder. ORS 426.005(1)(e)(A).[1] In particular, appellant contends that evidence pertaining to his refusal to take insulin for his insulin-dependent diabetes was legally insufficient to establish the requisite danger to self. We disagree and, thus, affirm.

Appellant asks that we review this matter *de novo*. We conclude that this is not an "exceptional" case that warrants *de novo* review. ORS 19.415(3)(b); *see* ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases."). Accordingly, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013) (stating our standard of non-*de novo* review of the facts, in the context of a juvenile court's determination of jurisdiction under ORS 419B.100(1)(c)). "We are bound by the trial court's findings of fact that are supported by evidence in the record." *State v. A. D. S.*, 258 Or App 44, 45, 308 P3d 365 (2013) (citing ORS 19.415(3)(b)). Consistently with the standard of review, the record discloses the following facts that are material to our review.

Appellant, a 23-year-old man, was diagnosed with Type I diabetes when he was approximately 14 years old and has since been dependent on the daily use of insulin and frequent daily blood-sugar monitoring to manage the disease. In 2010, appellant told his family and friends that God speaks to him "from the heart," offering directives. Appellant believed that "the Holy Spirit dwells in [his] head and [his] mind and [his] heart," and that God designed a

---

[1] ORS 426.005(1) provides, in part:

"(e) 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:

"(A) Dangerous to self or others."

"mission" for him to follow—a journey to Cartagena, Columbia, to operate a coffee plantation. Both appellant and his father testified that, before the onset of auditory delusions, appellant actively and successfully managed his treatment for diabetes by following an insulin regime. Appellant kept a "meal blog" and self-administered insulin shots, as well as testing his blood sugar level "at every meal and then before * * * bed."

In May 2010, appellant stopped taking insulin for a period of one or two days because he believed that God had healed his diabetes. Friends and family were able to convince him that not taking insulin was a mistake. Appellant's father testified to a noticeable and "pretty scary" change in appellant's behavior around June 2010. Appellant began to act aggressively around his family; he had "explosive" episodes involving swearing and "relentless" confrontation. Between July and September 2010, appellant saw two psychiatrists. One prescribed medication consistent with a diagnosis of bipolar disorder. However, appellant would not take that medication because he was "not mental."

Appellant continued hearing voices. In early October 2010, he deviated from his usual routine, failing to call his parents from a transit center from which they ordinarily picked him up. His parents found appellant in Olympia, Washington, where he had made contact with an ex-girlfriend in an unsuccessful attempt to bring her on his mission. Appellant adamantly refused to return home with his father and subsequently refused to accept diabetic supplies from his mother. On October 12, appellant traveled to Portland, where he met with a cousin; however, he also declined his cousin's offer to get insulin. His cousin provided appellant with dinner and a hotel room.

The following day, police officers were dispatched to the hotel to conduct a welfare check and found appellant alone in his room, in his underwear. He appeared tired but was capable of discussing his situation. Appellant readily admitted that he had ceased taking insulin five or six days earlier. The officers contacted Project Respond, requesting an evaluation. The Project Respond evaluator recommended hospitalization because appellant's grandiose thought and

command hallucinations put appellant at risk for serious physical harm—risk that "his body would shut down due to blood sugar issues." As a result of that evaluation, appellant was hospitalized.[2] At the ensuing civil commitment hearing, appellant testified that his blood-sugar level had been elevated, between 300 and 400.[3]

At the time of the hearing, appellant had little or no money and was dependent on others to satisfy his needs for food and shelter. Appellant demonstrated considerable awareness of the risks associated with failing to take insulin. For example, he testified that, once a person's blood sugar reaches levels of 400 to 500, the person could lapse into a diabetic coma and experience blindness and other organ damage. As appellant remarked, "it's my eyesight and my kidneys and my toes. And I'm very aware that that's some serious crap * * *."[4]

Appellant adamantly believed that his body was invulnerable to the deleterious effects of diabetes because God would "sustain [his] blood sugar supernaturally." He explained:

> "I trust you, Lord, to this degree. I know this is crazy, but I trust you with the blood sugar. He said, 'Just eat anything. You still have diabetes, but I'm going to sustain it, so it doesn't affect your blood—your nerves or your organs.' Okay. So I said, 'Okay, Lord.'"

He further explained that he was concerned about his parents' interference and intervention; he believed that "[t]he Lord told [him] this would happen, they would be following [him] * * * in the name of Satan, in the name of niceness." Appellant denied that he was bipolar, rejected treatment for mental illness, and stated that he did not want prescribed medication to treat bipolar disorder upon his release. However, the record shows that appellant's rejection

---

[2] Project Respond employees make on-scene safety determinations of individuals who may need support or medical attention.

[3] The only evidence of appellant's blood sugar level is his testimony. No hospital test results were offered as exhibits or discussed at the hearing.

[4] At the hearing, the Project Respond worker who interacted with appellant also testified as to the serious consequences of the failure to inject insulin. That testimony is set out below. See 258 Or App at 734-35.

of a bipolar diagnosis is, at least in part, also a result of his delusions. For example, appellant testified that "[t]he Lord is also saying I don't have bipolar disorder." Appellant also testified that he wanted to obtain a credit card and travel to California to continue fulfilling his "plan."

Both court examiners attributed appellant's delusions to a bipolar disorder. One examiner concluded that appellant's delusions, "impulsivity," and "unrealistic plans" created a risk that the examiner believed "can be life threatening."

The trial court determined that appellant was mentally ill and posed a danger to himself and entered a judgment ordering his civil commitment for a period not to exceed 180 days. ORS 426.005(1)(e)(A). In reaching that determination, the trial court stated:

> "[T]he concern to me here is * * * that [appellant] has to listen to and comply with these hallucinations or these voices from God, that there is no option not to follow through with them. * * * He also has been told to ignore the assistance from friends and family. And in particular I was concerned about when the cousin testified that he offered to bring [him] to the hospital to obtain more supplies for his insulin, he didn't * * * God is telling him to ignore the assistance being offered to him."

On appeal, appellant argues that the trial court's determination that he posed a danger to himself rests on legally insufficient evidence. For the reasons that follow, we disagree.

A court may order involuntary commitment of a person for up to 180 days if the court finds clear and convincing evidence that, as a result of a mental disorder, the individual is, *inter alia*, "[d]angerous to self." ORS 426.005(1)(e)(A); ORS 426.130(b)(C). As we have held in "danger to self" civil commitment cases, an individual's mental disorder must, at minimum, cause the individual to act in a way very likely to result in physical harm in the near future. *State v. Olsen*, 208 Or App 686, 691, 145 P3d 350 (2006) (citing *State v. Webb*, 186 Or App 404, 409, 63 P3d 1258 (2003)). "Specifically, the requisite danger to self cannot be based on mere unsubstantiated apprehension or speculation. Rather, it must partake

of a particularized, and highly probable, threat to [the] appellant's safe survival, including a risk of substantial harm, in the near future." *State v. B. B.*, 240 Or App 75, 84, 245 P3d 697 (2010) (internal quotations omitted).

Appellant invokes our decision in *State v. Hayes*, 202 Or App 63, 65, 121 P3d 17 (2005), contending that the evidence here was legally insufficient to establish the requisite serious, near-term risk of harm from his refusal to take insulin for his diabetes. In *Hayes*, the appellant, a 49-year-old woman diagnosed with a schizoaffective disorder and diabetes, refused medication for both the psychological disorder and the diabetes.[5] The trial court determined that the appellant was a danger to herself. *Id.* On appeal, we reversed, holding that the record was deficient with respect to the specific risks attending the appellant's diabetic condition and that "concern about potential future dangers to [the] appellant from acting in response to her auditory hallucinations [was] too attenuated and speculative to satisfy the 'clear and convincing' standard." *Id.* at 71.

Here, we are presented with a close case as to the sufficiency of evidence regarding an injury in the near future from appellant's failure to take insulin for his diabetes. Additional more particularized evidence—including medical testimony pertaining precisely to appellant's elevated blood sugar level—would have assisted the trial court's innately fact-based inquiry. *State v. Roberts*, 183 Or App 520, 524, 52 P3d 1123 (2002) (observing that "[w]hether the evidence in any case is sufficient must be decided on its own facts; fact-matching is not helpful"). Nevertheless, and unlike in *Hayes*, we cannot say that the record here is legally insufficient to sustain the trial court's determination. That is so because, here, we are presented with a record that discloses the probable consequences of appellant's behavior. *Cf. Hayes*, 202 Or App at 65 (observing that "the record does not disclose probable, or even possible, consequences of that refusal and noncooperation"). It is uncontroverted that appellant hears voices. Appellant's own testimony, as well as the conclusion of the examiners, reveals that he experiences delusions and

---

[5] The record in *Hayes* "does not disclose the nature or severity of [the appellant's diabetic condition]." *Id.* at 65.

believes, based on his delusions, that he is invulnerable to harm caused by diabetes. Further, on this record, the trial court could properly infer that appellant's delusions would continue, and, because of his refusal to take medication, but for his hospitalization, appellant would have continued to refuse to use insulin. Appellant's delusions are inextricably tied to his refusal to use insulin; appellant ceased taking insulin precisely because of his belief that God directed him to do so. As we explain later, the record demonstrates a nexus between appellant's belief that he could stop taking his medications without any ill or adverse effect and the near future onset of serious medical consequences from untreated diabetes.

Appellant also relies on the fact that neither examiner recommended civil commitment based on a "danger to self" ground. Rather, both examiners stated that appellant should be committed because he was unable to take care of himself.

There is a meaningful legal distinction between a determination that a person is mentally ill as a result of posing a "danger to self" and as a result of inability to provide for "basic personal needs." ORS 426.005(1)(e)(A) - (B). As a matter of statutory construction, we assume that the legislature does not create superfluous language. *State v. Stamper*, 197 Or App 413, 418, 106 P3d 172, *rev den*, 339 Or 230 (2005) (observing that "we assume that the legislature did not intend any portion of its enactments to be meaningless surplusage"). Further, danger to self cases and inability to provide for basic needs cases follow distinct inquiries. "[A] person can be deemed dangerous to self if he or she has established a pattern in the past of taking certain actions that lead to self-destructive conduct, and then he or she begins to follow the pattern again." *Roberts*, 183 Or App at 524. For example, in *State v. D. R.*, 239 Or App 576, 585-86, 244 P3d 916 (2010), we affirmed a judgment of civil commitment based on "danger to self" where the appellant, who inconsistently took her medication and who "exhibited impaired judgment, scattered thoughts, and somewhat disorganized, impulsive behavior," crossed the street into oncoming traffic and drove dangerously. In that

case, we observed that the evidence supported the likelihood that the appellant would repeat her inherently risky behavior in the near future, thereby posing a danger to herself. *Id.* at 586. On the other hand, "[t]he 'basic needs' commitment standard focuses on an individual's capacity to 'survive, either through his own resources or with the help of family or friends.'" *State v. Baxter*, 138 Or App 94, 97, 906 P2d 849 (1995) (quoting *State v. Bunting,* 112 Or App 143, 145, 826 P2d 1060 (1992) (internal quotation marks omitted)). For example, in *Bunting,* we affirmed a judgment of civil commitment based on the appellant's inability to meet his basic needs where the appellant who was disoriented, agitated, and sometimes aggressive, "refused to eat, claiming without any factual basis that someone was poisoning the food." 112 Or App at 146. Our decision in *Hayes* further aids in distinguishing those two independent inquiries, while illustrating that the same evidence may satisfy either inquiry. *Hayes,* 202 Or App at 70 (comparing *State v. Nguyen,* 180 Or App 541, 545, 43 P3d 1218 (2002), with *State v. Ayala,* 164 Or App 399, 404, 991 P2d 1100 (1999)). Therefore, the legal conclusions, "danger to self" and failure to meet "basic needs," are not synonyms and cannot be conflated. Nevertheless, we review the trial court's judgment to determine if it permissibly concluded that appellant is a mentally ill person, who, because of a mental disorder, is a danger to himself.[6]

The state presented *non*expert testimonial evidence that demonstrates a risk of particular harm to individuals afflicted with insulin-dependent diabetes where the disease is not treated, including diabetic coma and potential death. For example, the attending Project Respond employee testified that failing to take insulin is "a serious concern," and she had discussed "the potential of a diabetic coma * * * and the possibility of dying" with appellant before his hospitalization. She further testified she believed that "his mental health symptoms were preventing him from taking care of his medical needs * * * which could cause him death."[7] Appellant also testified:

---

[6] It bears repeating that we review only for legally sufficient evidence in support of the trial court's determination. *A. D. S.,* 258 Or App at 45.

[7] Appellant did not object to the admission of that lay opinion testimony or suggest that it was somehow inadmissible under OEC 701.

"If [blood-sugar level] gets like 4[00] or 500 you can go into a coma, you could pass out and do really serious damage to your kidneys, the eyes, the nervous system, stuff like that."

Additionally, appellant's testimony suggested that he was only cooperating with the hospital's treatment regime to placate medical personnel so that he could be released.

Thus, viewed consistently with our standard of review, the record discloses a nexus between high blood-sugar levels, such as appellant had on hospitalization, and serious physical damage; they are positively correlated and linked closely in time, in the case of an individual with insulin-dependent diabetes. The record shows that, when appellant was hospitalized after five or six days of abstaining from insulin, his blood-sugar level approached a dangerously high level that could cause serious physical injury; his blood-sugar level was elevated between 300 and 400 at the time of his hospitalization. And, his blood-sugar level stabilized and "leveled out" after he received medical treatment. That evidence substantiating the near term risk of serious, even lethal, physical injury transcends mere apprehension, speculation, and conjecture. *See B. B.*, 240 Or App at 83; *Ayala*, 164 Or App at 404 ("[A]lthough a person can be committed on the 'danger to self' basis before he or she is on the 'brink of death,' the prospect of serious physical harm must be more than merely 'speculative.'").[8] Given that evidence, we are mindful here of the principle that grave physical harm need not actually occur before a court may find a person to be mentally ill who is dangerous to him or herself or others; rather, "the threat must exist in the *near future.*" *Nguyen*, 180 Or App at 545 (emphasis added); *Olsen*, 208 Or App at 691 (holding that the state must show that the person's "mental disorder would cause him or her to engage in behavior that is likely to result in physical harm to himself or herself in the near term").

---

[8] We reversed judgments of civil commitment in *Nguyen* and *Ayala*, cases in which the respective appellants had diabetes. *Nguyen*, 180 Or App at 545; *Ayala*, 164 Or App at 404. However, "[c]ase matching is not particularly helpful in these kinds of cases; each case must be decided on its own facts." *State v. Jayne*, 174 Or App 74, 82, 23 P3d 990, *rev den*, 332 Or 316 (2001). Thus, *Nguyen* and *Ayala* are distinguishable because those records lacked legally sufficient evidence, whereas here we hold that the evidence is legally sufficient.

In sum, the evidence supports that rising blood-sugar levels are likely to cause near term serious physical harm in an insulin-dependent individual; there was legally sufficient evidence for the trial court to determine that, because of appellant's delusion-driven refusal to take insulin, he was dangerous to himself. ORS 426.005(1)(e)(A).

Affirmed.