LAGESEN, J., dissenting.
I respectfully dissent. The record before the trial court is one that permits the determination that, at the time of the commitment hearing, appellant's mental disorder made him "dangerous to self or others" within the meaning of ORS 426.005(1)(f)(A).
*691 At the time of the hearing, appellant was suffering from a very specific delusion as a result of his mental disorder: He was a private security professional who provided security services for Amtrak and assisted *313 bounty hunters. Appellant was not merely suffering from the delusion, he was acting in accordance with it. He had a uniform. He had a duty belt. He was equipped with some of the tools of the trade: handcuffs, a flashlight of the type that law enforcement is trained to use as a "striking instrument," and pepper spray.[1] Appellant also believed that several people, if not more, were after him and wanted him dead.
The psychiatrist who examined appellant opined that appellant's delusion "would put him in harm's way" and pose a risk of harm to others, due to the particular nature of the profession of which appellant believed he was a part: "[T]hat's a violent profession, or can be a violent profession, and with his grandiose and paranoid delusions I think that there is a reasonable probability that there could be some violence involved." One of the police officers involved in taking appellant in for a mental health evaluation elaborated on the nature of the risk that appellant faced if he acted in accordance with his delusion: "[H]e'd definitely be putting himself in harm's way attempting to take somebody into custody or taking law enforcement action when he's not a-a trained person."
Appellant's delusions previously have put him at risk of harm. In 2001, they led to an incident in which he pulled out a pellet gun when confronted by police. This, in turn, led to police firing at appellant with beanbag rounds.[2]
*692 Appellant had to be taken away on a stretcher. Appellant's mother, who is well acquainted with the history of appellant's mental illness and provided that history to the court, explained that appellant's current symptoms were the same kinds that he exhibited in 2001, only the delusions this time were "more intense" than the delusions that led to his prior interaction with police. Based on her past and present observations of petitioner, she thought he was at risk of hurting someone else physically, explaining that she had seen him "in situations where he's fighting." She also thought that his delusion of being a bounty hunter was "something that puts him in harm's way" because of what would happen if he acted those things out.
Appellant was a danger to self within the meaning of ORS 426.005(1)(f)(A) if his behavior, as a result of his mental illness, was "likely to result in physical harm to [him] in the near future." State v. J. G. , 218 Or. App. 398, 401, 180 P.3d 63, rev. den. , 345 Or. 94, 189 P.3d 750 (2008). Appellant was a danger to others if his mental disorder made it "highly likely" that appellant would commit a violent act toward another person in the near future. State v. L. D. , 247 Or. App. 394, 400, 270 P.3d 324 (2011). Here, the facts adduced at the hearing would permit the conclusion that both standards were met. It is not unreasonable to think that, without treatment, appellant likely would continue to act in accordance *314 with his specific delusion of being a bounty hunter or private security provider and would attempt to take someone into custody. It is hard to see how that act would not likely result in someone (either appellant or another person) getting hurt, absent the fortuity that anyone with whom appellant chose to engage would be sensitive to his mental illness and know how to defuse the situation without the use of force. *693 I recognize that appellant's delusion had not yet resulted in physical harm to anyone, and that it is not certain that it would. But certainty that a person is dangerous, or even proof beyond a reasonable doubt that a person is dangerous, is not required for civil commitments in Oregon. The point of the civil commitment statutes is to ensure that persons whose mental disorders make them "likely to be dangerous" receive needed treatment, averting the risk that a person's mental disorder will lead to serious harm or death. See Addington v. Texas , 441 U.S. 418, 428-29, 99 S.Ct. 1804, 60 L.Ed. 2d 323 (1979) (discussing the interests animating civil commitment statutes). As we have explained, "grave physical harm need not actually occur before a court may find a person to be mentally ill who is dangerous to him or herself or others." State v. C. C. , 258 Or. App. 727, 735, 311 P.3d 948 (2013). Rather, it simply must be infer-able that, given the particular facts of a case, such harm is highly likely to occur in the near future if the person's mental disorder is not treated. See id . In my view, that inference permissibly can be drawn from the specific facts present in this case.

At the time that appellant was taken in for evaluation, the pepper spray was in appellant's baggage and not in its holster on appellant's duty belt. It is not unreasonable to think that appellant had stowed it in his baggage for purposes of the train trip and would have put it in its holster in the near future.

The majority opinion characterizes the use of beanbag rounds as a "precaution." I see nothing in the record that permits the inference that the rounds were precautionary, as distinct from a preliminary effort to subdue appellant using nonlethal force before resorting to lethal force. Regardless, the fact that beanbag rounds are nonlethal does not mean that appellant was not at risk of physical harm in the prior incident. The Ninth Circuit has explained the operation of beanbag rounds:
"The shot is not like a regular bullet-it does not normally rip through soft tissue and bone on contact with the human body. It is designed to knock down a target, rendering the individual incapable of resistance, without (in the normal course of deployment) resulting in death. Nonetheless, the cloth-cased shot constitutes force which has the capability of causing serious injury, and in some instances does so."
Deorle v. Rutherford , 272 F.3d 1272, 1280 (9th Cir. 2001), cert. den. , 536 U.S. 958, 122 S.Ct. 2660, 153 L.Ed.2d 835 (2002). As noted, in the 2001 incident, appellant was taken away on a stretcher after he was shot with the beanbag rounds; his mother, upon seeing him, thought he was dead. Further, if the beanbag rounds had not disabled appellant in the 2001 incident, it is reasonable to think that officers would have progressed to using a greater degree of force to address the perceived threat posed by appellant and his pellet gun.