Submitted January 4, 2019, reversed January 6, 2021

In the Matter of M. T.,
a Person Alleged to have Mental Illness.
## STATE OF OREGON,
*Respondent,*

*v.*

## M. T.,
*Appellant.*

Marion County Circuit Court
17CC06975; A166509

479 P3d 541

Appellant challenges an Order of Disposition involuntarily committing her to the custody of the Oregon Health Authority. Appellant argues that the trial court erred when it concluded that her mental disorder caused her to be a danger to herself and unable to provide for her basic needs. Appellant also argues that the trial court erred when it indicated in the Order of Disposition that she was subject to commitment based on the expanded criteria of ORS 426.005(1)(f)(C) without giving prior notice to appellant of that possible ground for commitment. The state abandons the argument that appellant is unable to provide for her basic needs and concedes that the additional ground for commitment under ORS 426.005(1)(f)(C) was a mistake. The state maintains, however, that the trial court correctly determined that appellant was a danger to herself. *Held*: The Court of Appeals agrees that commitment was not appropriate under the two bases that the state declines to defend on appeal. Further, the record is legally insufficient to establish that appellant was a danger to herself; therefore, the trial court erred in committing her.

Reversed.

Susan M. Tripp, Judge.

Joseph R. DeBin and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jonathan N. Schildt, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, and Shorr, Judge, and Landau, Senior Judge.

LANDAU, S. J.

Reversed.

**LANDAU, S. J.**

Appellant challenges an Order of Disposition involuntarily committing her to the custody of the Oregon Health Authority for up to 180 days. She argues that the evidence was legally insufficient to establish that she suffered from a mental disorder that makes her a danger to herself. We agree with appellant that the evidence is insufficient and therefore reverse.

Neither party requests *de novo* review. Accordingly, we view the evidence in the light most favorable to the trial court's decision and assess whether, in that light, the record is legally sufficient to support that decision. *State v. M. J. F.*, 306 Or App 544, 545, 473 P3d 1141 (2020).

Appellant suffers from bipolar disorder. She had been hospitalized on previous occasions. At least one time, she had been found in the community disrobed, wandering the streets. During the year before her commitment, she lived in a group home and, according to staff, did "really well." Sometimes she wandered the streets at night. She thought of it as "like a neighborhood watch." She also found it "peaceful."

About two weeks before the hearing she began experiencing increasing agitation. She left the home on occasion and ended up having "six or seven police contacts" of an unspecified nature. She started to isolate and did not come out of her room for meals. She began yelling at night, expressing worry about "people getting murdered" and "hearing gunshots." She was fearful that staff was poisoning her and others and that staff was "raping people."

One of the staff at the group home, Hoover, became concerned about appellant's behavior. Appellant accused Hoover of stealing things from her and said that Hoover was "doing drugs." Appellant "cornered" Hoover "several times." By "cornering," Hoover explained that appellant walked around a large desk and came into her personal space, speaking without making any sense. Appellant "never laid a hand on [her]" and did not physically threaten her, but appellant's behavior made Hoover feel "intimidated" and "unsafe." On one occasion, Hoover observed appellant "pacing actively in

and out of her room," saying to herself "I'm going to kill her. I'm going to kill myself. I'm going to kill you." Hoover did not know to whom appellant was referring, however.

Appellant's behavior led to her hospitalization. One of appellant's physicians, Costa, reported that she "can come across as quite intimidating and threatening." Costa noted that, while at the hospital, appellant was observed "pacing angrily down the hallway and deliberately bumping into" a staff member and that she had poured water on another staff member. On another occasion, appellant was observed "slamming herself up against the wall." Costa commented that it was not apparent that appellant was targeting anyone or that she intended to harm anyone.

The circuit court issued a citation ordering appellant to appear for a commitment hearing. Attached to the order was a precommitment investigation report, which included check-the-box recommendations to the court. The recommendations were that appellant had a mental illness that caused her to be a danger to herself and to others and that she could not provide for her basic needs. The recommendations further indicated that appellant was not chronically ill and subject to commitment based on the expanded criteria of ORS 426.005(1)(f)(C), which provides that a person also may be committed if the person has a chronic mental illness, has previously been hospitalized under state authority for substantially similar reasons, and will likely deteriorate unless treated.

At the commitment hearing, Costa testified that appellant posed a danger to herself because "[she] can get into such a grossly disorganized state that she will inadvertently place herself in dangerous situations." He could not say whether, if released, appellant would engage in aggressive behavior. His concern was based on reports of such behavior as wandering the streets, suggesting that "she'll put herself in a—in a very dangerous situation because of grossly disorganized lack of awareness."

A civil commitment investigator, Stephens, was also asked whether appellant posed a danger to herself. Stephens replied that "I believe that she could be," based on

the overheard statements that she was going to kill herself and the fact that she had thrown herself against the walls.

And the mental health examiner, Anderson, concluded that appellant suffers from a chronic mental disorder. He said that, because of that disorder, "I do believe that she is dangerous to herself and that she will put herself in harm's way imminently, due her—due to her disorganization, mania, and psychosis."

The trial court concluded that appellant "is dangerous to herself and unable to provide for her basic personal needs necessary to avoid serious physical harm in the near future. And that *** [r]eceiving that care is necessary to avoid such harm." In the Order of Disposition, the trial court checked boxes indicating that appellant is a person with a mental illness, is dangerous to herself, and is unable to provide for her basic needs. Also checked is a box indicating that appellant "meets the criteria set forth in ORS 426.005(1)(f)(C)," although the trial court's oral findings did not mention that ground and, as we have noted, the citation expressly stated the contrary.

On appeal, appellant advances two assignments of error. First, she argues that the trial court erred in concluding that her mental illness caused her to be dangerous to herself and unable to provide for her basic needs. Second, she argues that the trial court erred when it indicated in the Order of Disposition that she was subject to commitment based on the expanded criteria of ORS 426.005(1)(f)(C), when she was not given prior notice of that possible ground for commitment.

In response to the first assignment of error, the state abandons the contention that appellant's mental illness causes her to be unable to meet her basic needs. But it does argue that the trial court correctly determined that appellant is a danger to herself. According to the state, "appellant engaged in intimidating and threatening conduct that was likely to provoke an assaultive response." In support, the state notes that appellant "cornered" a staff worker at her group home, threw water on a hospital worker, deliberately bumped into another worker, accused others of

stealing from her and "raping people," and threatened to kill herself and others. That behavior coupled with her tendency to wander the streets, the state argues, is likely to put appellant into harm's way.

As for the second assignment of error, the state concedes that the portion of the trial court's Order of Disposition indicating the additional ground of commitment for chronic mental illness under ORS 426.005(1)(f)(C) "appears to be a mistake." We accept that concession.

We turn, then, to the issue of the sufficiency of the evidence to demonstrate that appellant's mental illness causes her to be a danger to herself. Whether the evidence is sufficient to support an order of involuntary commitment is a question of law. *State v. T. Y.*, 285 Or App 21, 24, 396 P3d 986 (2017).

The law permits an order of involuntary commitment if the state proves, by clear and convincing evidence, that a person has a "mental illness," ORS 426.130(1)(a)(C), that causes the person to be "[d]angerous to self," ORS 426.005(1)(f)(A). To establish that a person is a danger to herself, the state must establish that the mental illness "would cause him or her to engage in behavior that is likely to result in physical harm to himself or herself in the near term." *State v. B. B.*, 240 Or App 75, 82, 245 P3d 697 (2010). The threat of physical harm must be "serious"—that is, it must be "'life-threatening' or involve some 'inherently dangerous' activity." *Id.* at 82-83; *see also State v. Judd*, 206 Or App 146, 153, 135 P3d 397 (2006) (reviewing cases so holding). In addition, the threat of serious physical harm must be "more than 'speculative.'" *State v. M. A.*, 276 Or App 624, 628, 371 P3d 495 (2016). That means that the evidence of such a threat must be "particularized," demonstrating a "highly probable" risk of harm "in the near future." *Id.* at 629.

That is not to say that the state must wait until serious physical harm actually occurs before a person may be considered a danger to herself. *See, e.g., State v. C. C.*, 258 Or App 727, 735, 311 P3d 948 (2013) ("[G]rave physical harm need not actually occur before a court may find a person to

be mentally ill who is dangerous to him or herself."). But the record must reflect some basis for determining that such serious harm is highly likely to occur in the short term, *id.*, as for example, when there is evidence that a person "has established a pattern in the past of taking certain actions that lead to self-destructive conduct, and then he or she begins to follow that pattern again," *State v. Roberts*, 183 Or App 520, 524, 52 P3d 1123 (2002).

In this case, the record does not reflect sufficient evidence to support a danger-to-self commitment. There is no evidence that appellant will engage in conduct creating a highly probable risk of serious physical harm in the near term. The state's assertion to the contrary amounts to little more than speculation.

At best, the evidence shows that appellant invaded the personal space of a staff worker in a way that made the worker feel "unsafe" and "intimidated." Appellant made no threats. Her behavior prompted no assaultive response. And there is a complete absence of evidence that invading another person's personal space is likely to result in serious physical harm. The record similarly shows that appellant "deliberately bump[ed]" into one staff worker and threw water on another. Again, however, there is no evidence that the sort of conduct appellant engaged in prompted any assaultive response or was of a nature that it would be highly likely to do so. *See Judd*, 206 Or App at 153 (order of commitment reversed when "there is no evidence that appellant's behavior has ever resulted in physical harm to him, life-threatening or otherwise" or "that he was likely to provoke violence").

The state emphasizes that appellant's physical acts were accompanied by "provocative claims" that, for example, others were stealing from her and that she had threatened to kill them. The record does show that appellant accused Hoover of stealing things from her. That, however, did not result in any sort of assaultive response, much less one likely to result in serious physical harm. Nor is there any basis for determining that such an accusation is likely to do so. Similarly, she expressed concern that staff had been poisoning and raping people. Again, however, there is nothing in

the record providing a basis for concluding that it is highly likely that saying such things would lead to serious physical harm.

As for the threats to herself and others, the record shows that Hoover overheard appellant talking to herself when she said "I'm going to kill her. I'm going to kill myself. I'm going to kill you." Hoover said that she did not know to whom appellant was referring, and there is no other evidence in the record that the threat was directed at anyone in particular or that her mention of suicide had ever been followed by any attempts to follow through on such a threat. *See, e.g.*, *M. J. F.*, 306 Or App at 547 ("[O]ur cases frequently identify a shortfall in the state's evidence of dangerousness when a person who *expresses* suicidal thoughts has not recently *attempted* suicide." (Emphases in original.)).

Finally, the state relies on evidence that, at some unspecified time in the past, appellant had wandered in the streets and that, more recently, her wandering had led to six or seven unspecified police contacts. But without more, there is no basis for concluding that such wanderings are highly likely to result in serious physical harm. *See, e.g.*, *Roberts*, 183 Or App at 525 (evidence that appellant wandered the streets frequently held insufficient because "the record contains no indication that this activity has ever led to injury").

In short, the record is legally insufficient to establish that appellant was a danger to herself. The trial court therefore erred in committing her.

Reversed.